**BALFOUR MACLAINE
INTERNATIONAL,
LTD., Plaintiff,**

v.

**John HANSON, as President of Foreign Credit Insurance Association, an unincorporated association, et al., Defendants.**

**No. 93 Civ. 8828 (AGS).**

United States District Court,
S.D. New York.

Feb. 8, 1995.

Chapman & Fennell, New York City, for plaintiff.

Fried, Frank, Harris, Shriver & Jacobson, Claude M. Millman, Asst. U.S. Atty., S.D. of N.Y., U.S. Dept. of Justice, New York City, for defendants.

## OPINION AND ORDER

SCHWARTZ, District Judge:

Currently pending before this Court is the motion of defendant Export–Import Bank of the United States ("Eximbank") to dismiss the complaint for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure and for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.[1] For the reasons set forth below, we grant summary judgment in favor of defendant Eximbank dismissing all claims against that defendant.

## BACKGROUND

In 1976, Eximbank and a group of subscribing insurance companies represented by the Foreign Credit Insurance Association ("FCIA") issued a credit insurance policy, entitled "Medium Term—Comprehensive Export Credit Insurance Policy" (the "Medi-

---

1. Eximbank moves, in the alternative, for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. We note that the parties have submitted affidavits and other evidence to the Court to be considered on the motion to dismiss. Such materials lie outside the four corners of the pleadings; accordingly, the court must either exclude the additional materials from our consideration and .decide the motion based solely upon the complaint, or convert the motion to one for summary judgment under Fed.R.Civ.P. 56, see Fonte v. Board of Managers of Continental Towers Condominium, 848 F.2d 24, 25 (2d Cir.1988); Carter v. Stanton, 405 U.S. 669, 671, 92 S.Ct. 1232, 1234, 31 L.Ed.2d 569 (1971); see generally 5 C. Wright & A. Miller, Federal Practice and Procedure, ¶ 1366 (1990 & Supp.1992) (discussing the circumstances in which a court may convert a motion to dismiss into a motion for summary judgment). The Court has determined to consider materials which the parties have submitted; therefore, we elect to convert this motion to dismiss into a motion for summary judgment, and interpret the expanded record accordingly.

um Term Policy"), to plaintiff Balfour's Fleetwood International Division. This policy provided coverage, within stated limits, for non-payment on medium-term credit transactions between Balfour and Corporacion Mercantil Venezolana S.A. ("Comersa"). Amended Complaint ¶¶ 7, 8; Affidavit of Joseph M. Piepul ("Piepuhl Aff.") ¶¶ 5, 6. In 1982, Eximbank and a second group of subscribing insurance companies represented by FCIA issued another credit insurance policy, entitled "Master Export Credit Insurance Policy" (the "Master Policy"), to Balfour. This policy provided limited coverage for non-payment on short and medium-term credit transactions entered into by Balfour during the course of the applicable policy year. Amended Complaint ¶¶ 7, 8; Piepul Aff., ¶¶ 5, 6.

During 1982 and 1983, Balfour exported goods to Comersa on credit, in a series of transactions insured by Eximbank and the participating insurers under the Medium Term and Master Policies. Amended Complaint ¶ 8. Thereafter, Comersa defaulted on its debts to Balfour, and, in 1983 and 1984, Balfour filed claims under both policies. *Id.*, ¶¶ 9, 10; Piepul Aff. ¶ 11 (and attached Exhibit D). Eximbank and the participating insurers approved Balfour's claims as insured commercial credit risks under both policies. Amended Complaint, ¶ 11; Piepul Aff. ¶ 12. Balfour received from Eximbank and the participating insurers $2,633, 753.03 under the Medium Term Policy and $271, 961.55 under the Master Policy, between March 2, 1984 and May 21, 1985. Amended Complaint, ¶ 11; Piepul Aff. ¶ 13. Balfour executed a release in favor of Eximbank and the participating insurance companies in consid-

eration for the foregoing payments under the policies. Piepul Aff. ¶ 14. This release, *inter alia,* released Eximbank and all the participating insurers from all causes of action relating to the claims and assigned to Eximbank and the participating insurers the right to collect the money owed by Comersa to Balfour. Piepul Aff.; ¶ 14.[2]

Subsequently, after negotiations between Comersa and Eximbank and FCIA, Eximbank received $3,164,013 in connection with the Balfour–Comersa transactions insured under the Medium Term Policy and $341,431 in connection with the Balfour–Comersa transactions insured under the Master Policy. Amended Complaint, ¶ 13; Piepul Aff., ¶ 15, 16.

With respect to the distribution of sums recovered by either the insured or insurer after the insurer has paid a claim submitted by the insured, the Medium Term Policy provides:

> After payment of any claim hereunder, any sums applicable to the *insured transaction* which are recovered from the buyer or any other source shall, after reimbursement of the expenses of recovery, be shared between the Insurers and the Insured in the proportion in which they shared in the original loss.

Medium Term Policy at 3 (attached as Exhibit C to Piepul Aff.) (emphasis in original). The Medium Term Policy defines "insured transaction" as "a sale or sales approved by the Insurers on conditions specified in the Transaction Endorsement...." *id.,* at 1 (emphasis in original). The Medium Term Policy also provides that the insurers bear 90% of losses incurred due to commercial credit

2. The Release and Assignment, attached as Exhibit E to the Piepul Aff., provides in relevant part:
   The Insured [Balfour] does ... release the Insurers [Eximbank and the participating insurers] from all debts, claims, demands, damages, actions and causes of action of whatsoever character and description which the Insured ever had, now has or hereafter can, shall or may have relating to this claim; except for the right to claim coverage under the political rights coverage in the policy.
   And, in further consideration of the above referenced amount paid to the Insured by the Insurers, the Insured does hereby assign,

transfer and set over to the Insurers, their successors and assigns, all right, title and interest in, to and under, and all sums of money now due, or to become due, to the Insured from the Buyer [Comersa] under the transactions and accounts relating to the Claim, and any and all contracts, security and evidences of indebtedness relating thereto; to have and to hold the same, with full power, at their own cost, to collect and enforce same, for their own use and benefit by any action or proceeding in the name of the Insured or otherwise, and to take all legal steps as they deem proper or necessary in connection herewith.

risks, while Balfour (the insured) bears 10% of such losses. *Id.*

The Master Policy contains the following provision relating to claims filed by the insured and paid by the insurer:

> After payment of any claim by the Insurers for any *loss* from any buyer ... any *recovery*, whatsoever, from such buyer with whom a *loss* has been experienced shall, after reimbursement of the expenses of recovery, be shared between the Insurers and the Insured. (i) The Insurers shall be entitled to a percentage of such *recovery* determined [in accordance with a formula providing for *pro rata* distribution]. (ii) Any *recovery* shall be shared on the foregoing basis until the Insurers recover in full all claim payment hereunder, after which all further *recoveries* shall be for the account of the Insured ...

Master Policy at 5 (attached as Exhibit B to Piepul Aff.) (emphasis in original).

Between September 1990 and April 16, 1991, Eximbank paid Balfour $316,401 in connection with the Medium Term Policy (10% of the sum recovered by Eximbank from Comersa on the transactions covered by the policy), and $69,375 relating to the Master Policy. Amended Complaint, ¶ 13.

### Procedural History of this Action

On May 3, 1991, Balfour commenced an action against FCIA in New York State court, seeking to collect $350,750.76 that FCIA allegedly owed to Balfour under the Medium Term and Master Policies. Piepul Aff., ¶ 1 and Attached Exhibit A (complaint filed by Balfour in the Supreme Court of the State of New York). On November 8, 1991, the action was dismissed without prejudice for failure to join Eximbank as a necessary party. Decision of the Supreme Court of the State of New York (Tom, J.), attached as Exhibit 4 to Declaration of Claude M. Millman ("Millman Dec.") On December 24, 1991, Balfour filed a voluntary petition for reorganization under Chapter 11 of the Bankruptcy Code. Exhibit 5 to Millman Dec., ¶ 2. On December 22, 1993, Balfour filed this action. Assignment of Claims by Balfour to Balmac International, Inc. ("Balmac"), Exhibit 1 attached to Millman Dec., at 1. On January 28, 1994, Balfour assigned all claims asserted in this action to Balmac. *Id.* On February 9, 1994, Balfour filed an amended complaint in this action and served it on Eximbank. Amended Complaint, attached as Exhibit 1 to Millman Dec. On February 25, 1994, the United States Bankruptcy Court for the Southern District of New York entered an order approving Balfour's assignment of its claims in this action to Balmac. Order Pursuant to 11 U.S.C. Sections 363(b) and (f) Approving Assignment of Certain Claims To Balmac International, Inc., attached as Exhibit 7 to Millman Dec.

### Balfour's Theory of the Case

The gravamen of Balfour's amended complaint is the assertion that only a certain portion of Balfour's transactions with Comersa were insured by the Master and Medium Term policies, and that, therefore, sums that Eximbank has recovered from Comersa that exceed the amounts insured under the policies belong to Balfour. Accordingly, the *ad damnum* of the amended complaint in this action demands for Balfour $213,953.00, with interest from the date that Eximbank recovered that sum from Comersa. Amended Complaint at 7.[3]

More precisely, Balfour's claim derives from its interpretation of the phrase "sums applicable to the insured transaction" in paragraph X ("Recoveries") of the Medium Term Policy.[4] Amended Complaint, ¶¶ 17, 18. Balfour alleges that Eximbank and FCIA "did not insure the full value" of the transactions between Balfour and Comersa inasmuch as the interest rate agreed to by Comersa in said transactions exceeded the interest rate insured by Eximbank and the participating insurers. *Id.,* ¶ 12. Balfour

---

3. These damages represent $213,859 Balfour claims that it is owed under the Medium Term Policy and $94 in connection with the Master Policy. Amended Complaint, ¶ 14.

4. The provision reads in pertinent part:

> After payment of any claim hereunder, any sums applicable to the *insured transaction* which are recovered from the buyer or any other source shall, after reimbursement of the expenses of recovery, be shared between the Insurers and the Insured in the proportion in which they shared in the original *loss* ...

contends that "[t]he amount of the Transactions insured under the Medium–Term Policy was $2,926,392," because a portion of the sum owed by Comersa to Balfour was interest for which Balfour could not recover under the Medium Term Policy. *Id.*, ¶ 18. Accordingly, Balfour alleges, "[t]o the extent that the [sums recovered by Eximbank from Comersa in connection with the Medium Term Policy] exceed [$2,926,392] they are not 'sums applicable to the insured transaction' within the meaning of· Paragraph X" of the Medium Term Policy, and Eximbank and the participating insurers hold those funds "in constructive trust" for Balfour. *Id.*

With respect to the Master Policy, Balfour notes that the policy ·provides that "after reimbursement of the expenses of recovery," all recoveries must be "shared between the Insurers and the Insured ... until the Insurers recover in full all claim payments hereunder," after which all further recoveries must be paid to the Insured. Master Policy, attached as Exhibit B to Piepul Aff., at 5. Balfour argues that insofar as the recovery made by Eximbank against Comersa exceeds claim payments (under the Master Policy) from Eximbank to Balfour by $94, Balfour is entitled to recover $94 from defendants. Amended Complaint, ¶ 14.

## DISCUSSION

### Standard for Summary Judgment

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c) The Second Circuit has stated that a "moving party may obtain summary judgment by showing that little or no evidence may be found in support of the nonmoving party's case ..." *Gallo v. Prudential Residential*

*Servs., Ltd. Partnership,* 22 F.3d 1219, 1222–3 (2d Cir.1994). The burden of proof, however, lies with the moving party and we must resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought. *Id.* The moving party must satisfy its burden of demonstrating the absence of a genuine issue of material fact, which can be done by pointing out that there is an absence of evidence to support the nonmoving party's case (and as discussed above, all ambiguities are resolved in the nonmoving party's favor). *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–25, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The non-moving party then has the burden of coming forward with "specific facts showing that there is a genuine issue for trial," Fed. R.Civ.P. 56(e), by a "showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. at 322, 106 S.Ct. at 2552.

As set forth below, we find that defendant Eximbank has established that no issue of material fact exists as to plaintiff's claims against Eximbank in this action. The undisputed record in this action demonstrates that the claims asserted by Balfour in the amended complaint must be dismissed on at least three grounds. We address each basis for dismissal below.

### The Assignment of Balfour's Claims to Balmac is Void

As noted *supra* at 55, Balfour assigned the claims asserted in this action to Balmac on January 28, 1994. The Medium Term and Master Policies, however, prohibit the assignment of any claims without the express written approval of Eximbank and the participating insurers.[5] Balmac does not allege that Eximbank and the participating insurers consented to the assignment of Balf-

---

5. The Medium Term Policy provides in relevant part: "This policy is assignable only with the approval in writing of the Insurers. No assignment by the Insured of any right, title or interest to any amount payable under this policy shall be valid or binding upon the Insurers unless the Insured shall have notified the Insurers thereof in writing on a form prescribed by the Insurers."

The Master Policy provides in relevant part: "No assignment by the Insured of any right, title or interest to any amount payable under this policy shall be valid or binding upon the Insurers unless the Insured shall have notified the Insurers thereof in writing on a form prescribed by the Insurers and shall have obtained the approval by the Insurers in writing."

our's claims to Balmac. Nor does Balmac allege that the application in the Bankruptcy Court for an order approving the assignment was served on Eximbank and the participating insurers. Indeed, defendants state that they had no notice of the application to the Bankruptcy Court. Defendant's Mem. at 7. We find, therefore, that the assignment is void under the Medium and Master Policies.

■ We note, moreover, that the Anti–Assignment Act provides that "a transfer or assignment of any party of a claim against the United States Government ... may be made only after a claim is allowed, the amount of the claim is decided, and a warrant for payment of the claim has been issued." 31 U.S.C. § 3727(a), (b). Accordingly, we find that Balfour's assignment of its claims against Eximbank, an entity of the United States Government, is void under the Anti–Assignment Act as well as the insurance policies. *See In re R & L Refunds, Inc.*, 96 B.R. 105, 108 (Bankr.W.D.Ky.1988) (declining to enforce assignment of claim against United States where assignment violated Anti–Assignment Act).

### Balfour's Claims Ignore the Plain Meaning of the Medium Term Policy

■ As set forth *supra* at 55–56, plaintiff contends that any recovery from Comersa in excess of the claim payment made by Eximbank and the participating insurers is not a "sum applicable to the *insured transaction*" within the meaning of the Medium Term Policy, and should be turned over to plaintiff. Amended Complaint ¶ 18. This contention is meritless.

The Medium Term Policy defines *"insured transaction"* as the "sale or sales approved by the Insurers" on the "Transaction Endorsement" attached to the policy. Medium Term Policy, attached as Exhibit C to Piepul Aff., at 1. Under the Medium Term Policy and the attached transaction endorsements, Eximbank and the participating insurers agreed to insure certain credit risks incurred by Balfour in connection with several "insured transactions," or sales to Comersa. *Id.* Each "insured transaction" was required by the Medium Term Policy to be for a "contract price," consisting of "a cash payment on or before delivery" and a "financed portion" evidenced by a "note." *Id.*, at 1–2. Under the Medium Term Policy, Balfour was insured for 90% of any "loss" incurred due to commercial credit risks. *Id.*, at 1. "Loss" is defined in the policy as

"the amount of the *default* on a *note*, including interest, if any, accrued and unpaid on the *note* to the date of the *default* computed on declining balances, at the rate specified in the Transaction Endorsement, less [*inter alia* ] any expenses saved by the insured by the non-payment of agents commissions, non-fulfillment of the contract of sale or otherwise."

*Id.*, at 2 (emphasis in original). In light of the foregoing definitions, we find that the plain meaning of "insured transaction," as that phrase appears in the Medium Term Policy, refers to the "sale or sales approved by the Insurers" rather than the portion of the contract price that is insured under the policy, as plaintiff contends. Accordingly, the figure of $2,926,392, identified by plaintiff as "[t]he amount of the Transactions insured under the Medium–Term Policy," Amended Complaint ¶ 18, in fact constituted Balfour's "loss" under the Medium Term Policy. It is undisputed that, pursuant to the terms of the policy, Eximbank and the participating insurers paid 90% of this sum; therefore, Eximbank and the participating insurers are entitled to 90% of "any sums applicable to the *insured transaction* which are recovered from the buyer." Inasmuch as Balfour does not dispute that Eximbank and the participating insurers paid to it 10% of the sum recovered from Comersa in connection with the Medium Term Policy, the claims in the amended complaint relating to that policy are dismissed.

### The Release and Assignment Entered Into by Balfour Bars Its Equitable Claims

The release and assignment executed by Balfour in favor of Eximbank and the participating insurers, at the time when Eximbank and the participating insurers paid Balfour's claim, provided that Balfour "assign, transfer, and set over to [Eximbank and the par-

ticipating insurers] ... all right[s], title, and interest in, to and under, and all sums of money [then] due, or to become due, to Balfour from [Comersa] under the transactions and amounts relating to the Claim, and any and all contracts, security and evidences of indebtedness relating thereto; to have and to hold the same, with full power ... to collect and enforce the same." Release and Assignment, attached as Exhibit E to Piepul Aff., at 1. Accordingly, by the terms of this release and assignment, Eximbank and the participating insurers are entitled to all sums that Comersa owed to Balfour in connection with the transactions in which Comersa defaulted.

## CONCLUSION

For all of the foregoing reasons, we grant defendant Eximbank's motion for summary judgment.[6]

SO ORDERED.

---

6. We note that defendant also argue that Eximbank, as an entity of the United States Government, is immune to suit by plaintiff. Defendant's Mem. at 15–18. Because we grant defendant Eximbank's motion for summary judgment on the alternative grounds set forth in this Opinion and Order, we decline to reach the issue of sovereign immunity.