Carol A. **GALLO**, Plaintiff–Appellant,

v.

**PRUDENTIAL RESIDENTIAL SERVICES, LIMITED PARTNERSHIP, doing business as Prudential Relocation Management, Defendant–Appellee.**

No. 576, Docket 93–7556.

United States Court of Appeals, Second Circuit.

Argued Nov. 10, 1993.

Decided April 27, 1994.

---

Anne Golden, White Plains, NY, for plaintiff-appellant.

Lawrence Peikes, Stamford, CT (Paul, Hastings, Janofsky & Walker, Stamford, CT, of counsel), for defendant-appellee.

Leonard N. Flamm, Nat. Employment Lawyers Ass'n, New York City, filed a brief for amicus curiae Nat. Employment Lawyers Ass'n.

Before: NEWMAN, Chief Judge, CARDAMONE and GOODWIN *, Circuit Judges.

CARDAMONE, Circuit Judge:

Plaintiff, Carol A. Gallo, appeals from a grant of summary judgment entered in the United States District Court for the Southern District of New York (Goettel, J.) in favor of Prudential Residential Services (Prudential). Gallo was an employee of Prudential. On this appeal we must decide whether summary judgment dismissing this employee's complaint alleging discrimination on account of age was properly granted to her employer.

The reason given by Prudential for termination was a reduction-in-force. Such action has become a common phenomenon sweeping corporate America as businesses downsize to meet competition and to increase productivity and profitability. Economic decisions of that sort are, of course, outside a court's purview. But sometimes the validity of a company's legitimate reduction masks, in an individual case, a discriminatory animus. Where an employee can show that reduction in force was a pretext for her discharge and she alleges facts which, if believed, would prove intentional discrimination against her because of her age, summary judgment is inappropriately granted the employer. Because plaintiff has alleged such facts, we reverse.

## BACKGROUND

Carol Gallo was hired by Merrill Lynch Relocation Management in 1982 as an inter-

---

* Hon. Alfred T. Goodwin, Senior Judge, United States Court of Appeals for the Ninth Circuit, sitting by designation.

nal communications specialist. She had previously been employed by Lear Siegler, Inc., as Manager of Marketing Services. In 1989, seven years after plaintiff began working for Merrill Lynch, the business was acquired by Prudential Relocation, which company became plaintiff's employer. After the acquisition, Prudential took over Merrill Lynch Relocation Management's White Plains, New York, headquarters and continued the relocation business with most of the same employees, including plaintiff Gallo. Internal Communications was part of Prudential's Human Resources Department headed by Michael New. In 1990 New, as Director of the department, promoted plaintiff to Manager of Internal Communications, a grade 29 position.

Gallo's responsibilities in that position were primarily concerned with communications to employees of Prudential. She published a newsletter, *The Relocators,* distributed to employees, and sometimes clients, four times a year. Gallo also developed and published a newsletter targeted toward the management staff of Prudential Relocation called *Management Tips,* as a means to support management in relating effectively with subordinates. She oversaw the production of three other publications: *Direct Line, Action Line,* and *Swap & Shop. Direct Line* was written to aid real estate brokers and relocation directors of real estate companies other than her employer. It provided tips on how to market homes effectively, how to help clients who would be relocating, and other related issues. *Action Line* was a vehicle through which employees could have their questions answered by senior management. *Swap & Shop* was a sort of in-house classified ad service for employees who wished to sell or buy something.

When Prudential was relocating two of its offices during 1990, plaintiff was responsible for developing an action plan for communicating with the company's employees in order to facilitate the move with the least disruption to the workforce and to provide continuing service to clients. In addition, Gallo was involved with two employee recognition programs, "Spirit of Leadership," and "Single Payment Bonus Program," directing

the former and marketing both to the employees and keeping the staff informed about them. Plaintiff alleged without dispute that in the course of her employment for the defendant and its predecessor, her responsibilities included working on any new internal communications functions her employer initiated. As a result of her effective performance of these multi-faceted duties she regularly received positive performance reviews—either good or excellent—from her supervisors.

In late 1990 and early 1991 Prudential experienced a downturn in its business. It decided to eliminate the Internal Communications Department and transfer any remaining work to Public Affairs, which later became the Marketing Department. *The Relocators* was transferred to Marketing and renamed *The Pinnacle.* The other four publications plaintiff was responsible for producing were then eliminated. The employee recognition and community affairs projects were retained by Human Resources and handled by a 49-year old employee.

Priscilla Toomey, Senior Vice-President for Public Affairs consulted Thomas Jago, Director of Marketing, to determine if he wanted Gallo transferred to his department. When Mr. Jago responded negatively, the decision to discharge plaintiff instead of Marketing Department employees was made. Thus, effective May 31, 1991 Gallo, then aged 50, was fired, receiving severance and outplacement assistance as part of her termination package. Mr. Jago and Mrs. Jeanne Marks, both in their thirties, took over publication of *The Pinnacle.* Other marketing employees contributed to the publication as needed, while continuing to perform marketing duties that were not part of the former Internal Communications Department.

Since May, 1991 when Marketing took over production of *The Pinnacle,* four members of that department have left Prudential. To fill these vacancies, Prudential ran a blind advertisement in a local newspaper soliciting applicants for the position of Communications Editor in charge of internal publications. Unaware that Prudential was the employer who placed the advertisement, Gallo responded. Jago was in charge of hiring for

this position. When he learned Gallo had applied, he declined to interview her. In his deposition, New stated the reason Jago did not interview Gallo could have been because "he was looking for a different skills set." Instead of considering Gallo, Jago interviewed six to eight women; several of whom were in their 20s. In March, 1992 one of these women filled the vacant position. Soon thereafter, Prudential hired another of these women as a Corporate Communications Specialist when another employee left the Marketing Department. Gallo contends that as a result of these actions Prudential, in one form or another, reinstated all the discontinued internal publications she had previously been in charge of and assigned production responsibility for these publications to the newly hired younger employees.

Prudential counters that the Marketing employees who presently have responsibility for internal communications functions continue to do external communications work, including writing proposals to clients, advertising, conference coordination and media contacts. Because Prudential substantially restructured marketing, it avers that the persons who filled the vacancies are not responsible for Gallo's previous duties.

Prudential does not dispute that it began production of several new publications within nine months or so of Gallo's discharge. *PDQ*, a newsletter supporting the company's total quality management effort, was initiated to keep employees informed of the program. At least one marketing employee spends approximately 30 percent of her time producing this publication. This same employee, in addition, spends 15 percent of her time writing for *The Pinnacle*. Prudential also initiated *Inside PRM*, an external publication targeted at brokers in the Prudential Network. *Special Delivery*, an electronic bulletin board, provides employees with access to current news about the company. *Open Phones* replaced *Action Line*.

In January 1992 plaintiff filed a complaint with the Equal Employment Opportunity Commission alleging Prudential discharged her because of her age. After concededly exhausting all administrative requirements, she commenced the instant action in the Southern District of New York alleging violation of the Age Discrimination in Employment Act of 1967 (ADEA), 29 U.S.C. §§ 621–634 (1988 & Supp. IV 1993), and the New York Human Rights Law, N.Y.Exec. Law §§ 290–296 (McKinney 1993). The complaint asserts she suffered extreme emotional distress and sought damages for lost wages and benefits, medical expenses, attorneys fees and costs along with injunctive relief and reinstatement.

When Prudential moved for summary judgment, the district court granted the motion dismissing plaintiff's complaint in a judgment entered May 11, 1993, stating that even if plaintiff had made out a *prima facie* case of age discrimination, she had failed to show that Prudential's reason for her termination was pretextual.

This appeal followed.

## DISCUSSION

### I

#### A. *Summary Judgment*

██ Considering how often we must reverse a grant of summary judgment, the rules for when this provisional remedy may be used apparently need to be repeated. First, summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Second, the burden is upon the moving party to demonstrate that no genuine issue respecting any material fact exists. *See Heyman v. Commerce & Indus. Ins. Co.*, 524 F.2d 1317, 1320 (2d Cir.1975). In considering that, third, all ambiguities must be resolved and all inferences drawn in favor of the party against whom summary judgment is sought. *See Eastway Constr. Corp. v. City of New York*, 762 F.2d 243, 249 (2d Cir.1985), *cert. denied*, 484 U.S. 918, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987). Fourth, the moving party may obtain summary judgment by showing that little or no evidence may be found in support of the nonmoving

party's case. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *DiCola v. SwissRe Holding (North America), Inc.*, 996 F.2d 30, 32 (2d Cir.1993). When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper. *See Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1114 (2d Cir.1988).

Fifth, when deciding whether this drastic provisional remedy should be granted in a discrimination case, additional considerations should be taken into account. A trial court must be cautious about granting summary judgment to an employer when, as here, its intent is at issue. *See Montana v. First Fed. Sav. & Loan Ass'n*, 869 F.2d 100, 103 (2d Cir.1989); *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir.), *cert. denied*, 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985); *Patrick v. LeFevre*, 745 F.2d 153, 159 (2d Cir.1984). Because writings directly supporting a claim of intentional discrimination are rarely, if ever, found among an employer's corporate papers, affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination. Finally, the trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution.

Reviewing a grant of summary judgment, we apply this same standard and determine *de novo* whether or not a genuine issue of material fact exists that would preclude judgment as a matter of law. *See Taggert v. Time Inc.*, 924 F.2d 43, 45–6 (2d Cir.1991). In examining the record it must be kept in mind that only by reference to the substantive law can it be determined whether a disputed fact is material to the resolution of the dispute. *See Dister*, 859 F.2d at 1114. In this case that law is the ADEA.

## B. *The ADEA*

The ADEA provides it is "unlawful for an employer ... to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1) (1988). The Act protects persons 40 years of age or older. *See id.* § 631(a) (Supp. IV 1993). The New York Human Rights Law affords similar protection. *See* N.Y.Exec.Law § 296(1)(a) (McKinney 1993). Under both the ADEA and the New York Human Rights Law the ultimate question is whether an employer discriminated against an employee on account of that person's age. *See* 29 U.S.C. § 623(a)(1); N.Y.Exec.Law § 296(1)(a).

The plaintiff of course has the ultimate burden of proof at trial to show discrimination in employment on account of age. *See Montana*, 869 F.2d at 103. Because Gallo alleges disparate treatment, we employ the familiar three-step burden shifting analysis developed in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668 (1973) and *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981), which applies to ADEA cases. *See Montana*, 869 F.2d at 103; *Dister*, 859 F.2d at 1112. When an employer initiates a reduction-in-force, an employee has the initial burden of establishing a *prima facie* case of unlawful age discrimination by showing 1) she belongs to the protected age group; 2) she was qualified to assume another position had it been available at the time she was discharged; 3) she was discharged; 4) and that the discharge occurred under circumstances suggesting that age was a factor. *See Maresco v. Evans Chemetics, Div. of W.R. Grace & Co.*, 964 F.2d 106, 110–11 (2d Cir.1992). If plaintiff meets this burden discrimination is presumed.

Assuming plaintiff establishes a *prima facie* case, the burden of production of proof shifts to the employer to articulate a legitimate non-discriminatory reason for discharging the employee. *See Taggert*, 924 F.2d at 46. If the defendant proffers such a reason, the burden is then on the plaintiff to show that the employer's stated reason was merely a pretext for discrimination; the pre-

sumption of age discrimination drops from the case and plaintiff retains the ultimate burden of proving the employer's reason for its adverse employment decision was a pretext for intentional age discrimination. *See Spence v. Maryland Casualty Co.,* 995 F.2d 1147, 1155 (2d Cir.1993).

The Supreme Court teaches that "a reason cannot be proved to be 'a pretext *for discrimination'* unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks,* —— U.S. ——, ——, 113 S.Ct. 2742, 2752, 125 L.Ed.2d 407 (1993) (emphasis in original); *see also Saulpaugh v. Monroe Community Hosp.,* 4 F.3d 134, 142 (2d Cir. 1993) ("[A] Title VII plaintiff does not necessarily meet its burden of persuasion by convincing the factfinder that the employer's non-discriminatory explanation is not credible; rather, the trier of fact must find that the plaintiff has proven its explanation of discriminatory intent by a fair preponderance of the evidence."), *cert. denied,* —— U.S. ——, 114 S.Ct. 1189, 127 L.Ed.2d 539 (1994).

What this means in the summary judgment context is that the plaintiff must establish a genuine issue of material fact either through direct, statistical or circumstantial evidence as to whether the employer's reason for discharging her is false *and* as to whether it is more likely that a discriminatory reason motivated the employer to make the adverse employment decision. *See Taggart,* 924 F.2d at 46; *Saulpaugh,* 4 F.3d at 142. The same procedure is used under the New York Human Rights Law. *See Tyler v. Bethlehem Steel Corp.,* 958 F.2d 1176, 1180 (2d Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 82, 121 L.Ed.2d 46 (1992).

## II

### A.  *Plaintiff's* Prima Facie *Case*

Gallo was within the protected age group as she was 50 years old when Prudential discharged her. She was qualified to perform the duties Prudential transferred to the Marketing Department. Concededly, she was discharged. We pass then to whether she showed her discharge occurred in circumstances giving rise to an inference of age discrimination. Upon Gallo's discharge, Prudential transferred most of her duties—the 60 percent attributed to publication of *The Pinnacle*—to the Marketing Department. Except for negligible duties transferred to a Human Resources Department employee who was also within the protected age group her remaining responsibilities were eliminated.

The duties that Prudential abolished consisted of the other four publications produced by the Internal Communications Department. But these publications, like Lazarus, had a new life and reappeared, though not in the same form. Within nine to ten months after plaintiff's discharge, four publications sprang up in the Marketing Department. *PDQ,* a newsletter devoted to total quality management, was established, and although the business philosophy of total quality management might be different from management by objectives, this publication appears to serve the same purpose as *Management Tips. Inside PRM,* an external publication targeted at brokers belonging to the Prudential Network is strikingly similar to the former publication, *Direct Line.* A combination of *Special Delivery,* an electronic bulletin board that keeps employees informed about company news and *Open Phones* seem to provide the same information as that once disseminated by *Action Line.* Thus, the only publication Prudential did not resuscitate was *Swap & Shop.* But Gallo only spent one percent of her time producing *Swap & Shop.*

We think Prudential's systematic resurrection of publications after Gallo's discharge sufficiently suggests that age was a factor in her termination. Moreover, Gallo's record, which revealed that she had previously served as Lear Siegler's Manager of Marketing Services, showed her qualified to assume a position requiring internal and external communication skills. Because plaintiff's burden of proof in an ADEA cause of action under the *McDonnell Douglas/Burdine* analysis is *de minimis* at this stage, *see Dister,* 859 F.2d at 1114, we conclude, contrary to the district court, that plaintiff met her burden of establishing a *prima facie* showing of age discrimination.

### B. *Prudential's Defense*

■ Once a plaintiff demonstrates a *prima facie* case of age discrimination, the defendant is obligated to produce evidence "which, *taken as true*, would *permit* the conclusion that there was a nondiscriminatory reason for the adverse action." *Hicks,* —— U.S. at ——, 113 S.Ct. at 2748 (emphasis in original). This explanation must be "clear and specific." *Meiri,* 759 F.2d at 997. Prudential presented affidavits of its various officers to· show that at the time it discharged Gallo the company was in a business downturn and that a reduction-in-force was necessary to meet its budgetary goals. This evidence is enough to rebut the presumption of age discrimination that Gallo's *prima facie* case established.

### C. *Pretext for Age Discrimination*

■ Although an employer is certainly entitled to reduce its force and structurally reorganize its operations to maximize efficiencies, it may not discharge an employee "because" of her age. *See* 29 U.S.C. § 623(a)(1). Gallo must demonstrate that the reduction-in-force at least in her individual case was a pretext for intentional age discrimination. This may be demonstrated by reliance on the evidence that established her *prima facie* case, without any additional evidence being required, *see Hicks,* —— U.S. at ——, 113 S.Ct. at 2749, or by presentation of additional evidence to show that Prudential's reasons for her discharge were false, *see Saulpaugh,* 4 F.3d at 142.

■ Although courts must be careful not to second-guess an employer's business judgment that it makes in good faith, plaintiff must be allowed to show that her employer's asserted reasons for discharging her were a pretext and that the real reason was her age. *See Hicks,* —— U.S. at ——, 113 S.Ct. at 2752. We turn to plaintiff's contentions regarding pretext that she insists create a question of fact regarding Prudential's reasons for her discharge.

1. *Revival of Publications.* We return first to Prudential's decision to revive the publications for which Gallo had responsibility when she was Manager of Internal Communica-tions. The linchpin of Gallo's contention concerns the transfer of 60 percent of her duties to the Marketing Department, Prudential's subsequent advertisement for the position of Communications Editor to be in charge of internal publications and Jago's failure to interview her for that position. The successful applicant for that position spends 50–60 percent of her time producing *The Pinnacle* and ten to 20 percent of her time working on *Special Delivery.*

Prudential's advertisement for the position of Communications Editor described the position as having responsibility for producing "several internal publications ... [and] creating employee recognition programs and other programs to enhance internal communications." The advertisement did not state that the position, as Prudential now contends, would include external communications. When Gallo saw the blind advertisement, she applied for the position. But Prudential declined to interview her. This failure to interview Gallo for the position is significant in two respects. First, Prudential contends that although the solicitation for the position of Communications Editor did not suggest the successful applicant would be responsible for external communications, this was the result. Prudential maintains that Gallo did not possess the necessary skills set in this field because in her position as Manager of Internal Communications she did not have external communications responsibility.

Gallo contends that although she may not have had external communications responsibility at Prudential, she had had previous experience while working for Lear Siegler when, as Manager of Marketing Services, she planned and organized all marketing literature; was involved in internal communications, trade shows, international representation, placement of ads in trade publications; acted as a liaison between the Sales and Marketing Departments; coordinated advertising programs; and handled public and media relations. Further, even before Lear Siegler, plaintiff had done public relations work for an advertising agency.

Thus, even were Prudential truthful in its assertion that the advertised position included responsibility for external communica-

tions, Gallo had extensive previous successful experience in that field. What Prudential intended when it advertised this position and why it did not interview Gallo who was well qualified for the position present genuine issues of material fact as to whether Prudential's reduction-in-force was a pretext in her case for age discrimination.

2. *Prudential's Policy Manual.* A second aspect of this advertisement is even more problematical. The employment relationship between Prudential and its employees is governed in part by a personnel policy and procedure manual. Although Merrill Lynch developed this manual, Prudential adopted it and it was in effect at the time Prudential discharged Gallo. Of particular significance is Section 10.4, Staff Reduction and Consolidation, which states:

> It is [Prudential] policy to make every effort to find new positions within the Company for employees whose jobs have been eliminated. They receive priority consideration by offices and departments filling openings.

> If employees are released because of a staff reduction or consolidation, they are eligible for rehire and severance pay.

Gallo contends that Prudential should have considered her for the position of Communications Editor pursuant to this provision of its personnel policy and procedure manual.

Although Prudential concedes it coded Gallo's termination papers for rehire, it now declares the above personnel policy and procedure manual provision applies only at the time the position is eliminated and that Prudential fulfilled this responsibility when Ms. Toomey considered and rejected a transfer of Gallo to the Marketing Department. Based on the employer's view, the second clause of the quoted section of the manual pertaining to employees' eligibility for rehire would be superfluous; adopting Prudential's interpretation would relieve it of any responsibility to rehire employees previously discharged because of a reduction-in-force. In the absence in this record of any official company statement interpreting this aspect of the manual, and in light of plaintiff's insistence that the rehire provision protects her, the district court was required to draw an inference un-

der the policy manual's terms favorable to Gallo when deciding Prudential's motion for summary judgment.

3. *Decision to Discharge.* The identity of the person who decided the plaintiff should be discharged is a third material issue of disputed fact. Plaintiff avers it was Thomas Jago, and the defendant says it was Priscilla Toomey. Jago is a young person, who hired or assigned in succession—in preference over plaintiff—four women much younger than plaintiff to do internal communications duties. Although Ms. Toomey technically may have made the decision not to retain the plaintiff, the undisputed evidence shows that she did so only because Jago refused to keep the plaintiff on in his department (Marketing) when it absorbed the Internal Communications department where she worked. The inference that Jago was the effective decisionmaker is permissible, or at least a rational factfinder could conclude that Jago, regardless of plaintiff's undisputed experience and qualifications, simply did not want her working for him because of her age.

Further, Ms. Toomey said she did not want to keep the plaintiff and give her tasks relating to external communications (marketing) because the plaintiff did not have enough experience in the relocation field to see issues from the client's viewpoint. Yet, the several young women hired into the Marketing Department to do both internal and external communications tasks had no experience in corporate relocation, and little background in writing. Such facts also support an inference of discrimination.

### III

Prudential relies on *DiCola*, 996 F.2d 30, as controlling this case. *DiCola* involved the discharge of an older employee whose job responsibilities had been substantially diminished over a period of years. *Id.* at 31. This diminution of responsibilities allowed what work remained to be absorbed by another, inferior position. *Id.* at 33. Unlike DiCola's responsibilities, Gallo's responsibilities were not diminished over a period of years, they were for the most part transferred, not eliminated as a result of a conscious decision by

Prudential. In this respect, the instant appeal is more like *Montana,* 869 F.2d 100, where Montana's job was eliminated, most of her duties were transferred to another employee, she was not offered the opportunity to transfer to another department and not considered for a new position when it was advertised. *Id.* at 105–06.

## CONCLUSION

In sum, the evidence presented regarding the resurrection of the publications for which Gallo had responsibility as Internal Communications Manager suggests that Prudential transferred approximately 99 percent of her work to the Marketing Department within nine months of her discharge. Gallo was also able to demonstrate that contrary to the plain language of its personnel policy and procedure manual Prudential refused to consider her for a position that required whoever filled it to devote up to 80 percent of that person's time doing work that she had previously performed. Gallo has also presented circumstantial evidence regarding the motivation of the decisionmaker who fired her that, if believed, would support her claim of discrimination. Plaintiff has therefore presented several genuine issues of material fact regarding whether Prudential's decision to discharge her because of a reduction-in-force was a pretext for intentional age discrimination. As a consequence, a grant of summary judgment in favor of Prudential was inappropriate.

Accordingly, the grant of summary judgment is reversed and the case is remanded to the district court with instructions to reinstate plaintiff's complaint and to conduct further proceedings in this matter on the merits.