**Anthony CAMARDA, Plaintiff,**

v.

**PAN AMERICAN WORLD AIRWAYS, INC., Centennial Life Insurance Co., and Adele M. Askin, Plan Administrator Group Life Long Term Disability Policy # 880186, Defendants.**

93–CV–0295 (JS).

United States District Court,
E.D. New York.

Jan. 31, 1997.

Mitchell J. Birzon, Lidia Szczepanowski, Birzon, Szczepanowski & Quinn, Smithtown, NY, for Plaintiff.

Robert Bodzin, Pulvers, Pulvers, Thompson & Kutner, New York City, Jonathan D. Farrell, Meltzer, Lippe, Goldstein, Wolf & Schlissel, P.C., Mineola, NY, for Defendants.

*MEMORANDUM AND ORDER*

SEYBERT, District Judge:

Plaintiff Anthony Camarda brings this action against defendant Pan American World Airways, Inc. ("Pan Am"), Centennial Life Insurance Company ("Centennial") and Adele M. Askin, as Plan Administrator for Group Life Long Term Disability Policy # 880186, asserting claims arising from Cen-

tennial's suspension of plaintiff's disability benefits. Pan Am and Askin were subsequently dismissed from the case, and Centennial remains the sole defendant.

Plaintiff asserts a cause of action under the Employees' Retirement Income Security Act, 29 U.S.C. § 1001 *et seq.* ("ERISA") and demands damages in an amount equal to the benefits withheld and a declaration by the Court as to the plaintiff's continuing right to receive benefits, together with the legal costs, legal fees plus interest and penalties. Before the Court are plaintiff's motion for summary judgment and defendant's cross-motion for summary judgment. For the foregoing reasons, the Court denies plaintiff's motion for summary judgment and grants defendant's cross-motion for summary judgment.

### FACTUAL BACKGROUND

The following facts are not in dispute unless indicated otherwise.

#### A. *Events Giving Rise to the Suspension of Benefits*

Plaintiff Anthony Camarda ("Camarda") was an employee of Pan Am from 1966 up to and through October, 1981. D's 3g Stmt., ¶ 5; P's 3g Stmt., ¶ 2. Camarda had been involved in several on-the-job accidents until he became totally disabled in October, 1981. P's 3g Stmt. ¶ 3.

As a result of Camarda's total disability, Centennial, which served as the Pan Am's disability plan administrator and underwriter, began paying disability benefits to Camarda in October, 1981 and continued to do so through December, 1990 in the amount of $1,405.04 per month. P's 3g Stmt. ¶ 4, 6. Such payments were made pursuant to Pan Am's Group Life Long Term Disability Policy # 880186 (the "Plan").

When Camarda initially began receiving disability benefits under the Plan, Centennial deducted an automatic offset because of an anticipated award of Social Security benefits. Matthews Aff. ¶ 15. Camarda's initial application for Social Security benefits on September 20, 1982, however, was denied on June 16, 1983. D's 3g Stmt., ¶ 17; Matthews Aff. ¶ 16. Aware that this denial of Social

Security benefits allowed him to increase his monthly benefits from Centennial, Camarda promptly submitted proof of his denial to the Plan in order to receive reimbursement for the prior offsets. D's 3g Stmt. ¶ 18; Matthews Aff. ¶ 17; Camarda Dep. at 108. Upon receipt of the decision denying Social Security disability benefits to Camarda, Centennial ceased the automatic offset and reimbursed him in the sum of $7,200. D's 3g Stmt. ¶ 19; Matthews Aff. ¶ 18.

On or about February 13, 1985, Camarda reapplied for Social Security benefits for the same work-related injuries. D's 3g Smt. ¶ 20; Camarda Dep. at 90. This time around, on April 23, 1986, Camarda was awarded Social Security disability and checks were mailed directly to Camarda, his wife and his sons. D's 3g Stmt. ¶ 21; Camarda Dep. at 91; Notice of Favorable Decision, Birzon Aff., Ex. J.

In the decision awarding these benefits, the Administrative Law Judge (the "ALJ") found Camarda to be disabled as a result of both physical and mental impairments arising from the prior work-related accident. Notice of Favorable Decision, Ex. J to Birzon Aff., at 7–8; Camarda Dep. at 92–93. In particular, the ALJ found Camarda to be under a "disability" as a result of orthopedic impairments beginning June 17, 1983 and a mental impairment beginning October 24, 1985. *Id.* Because the ALJ was procedurally barred from considering any impairments assessed in the prior ALJ decision of June 16, 1983, the decision addressed solely impairments that arose after the date of the prior denial. *Id.* On May 20, 1986, the Social Security Administration issued to Camarda a "Social Security Award Certificate" in the amount of $14,239.80 to cover disability benefits from June 17, 1983 through April 1986 for both physical and mental impairments. Social Security Award Certificate, Matthews Aff., Ex. 5.

Upon receiving this award, Centennial claims that Camarda refused to inform the Plan that he was receiving Social Security benefits, even though Camarda knew that the Plan required deducting Social Security benefits. For example, in his deposition, Camarda stated that at the time he mailed in

the proof of denial of his first Social Security claim, he understood that if he were to start receiving Social Security benefits, that amount would be deducted from the disability benefits from Centennial. Camarda Dep. at 112. Despite Camarda's understanding, Centennial claims that beginning in 1985, Centennial had to repeatedly ask Camarda to provide authorizations so that it could review his Social Security disability benefits file and determine whether Camarda was receiving Social Security disability benefits. Matthews Aff. ¶ 23.

Camarda conceded during his deposition that he did not inform Centennial that he began receiving Social Security benefits until sometime in 1994. Camarda Dep. at 112–113. He further explained that he did not inform Centennial of the award because he was embarrassed about having been found to have a mental impairment. Camarda Dep. at 113. In addition, Camarda did not report the award because he believed that he did not have to report any Social Security disability awards for a mental impairment. Camarda Dep. at 113.[1] This belief stemmed from his review of the Centennial Summary Plan Description, which he believed excluded coverage for mental impairments. Camarda Dep. at 113. Camarda conceded, however, that his mental impairment arose because of the physical injuries he sustained while working for Pan Am. Camarda Dep. at 115.

The parties dispute, however, *when* Centennial began to ask for an authorization to review Camarda's Social Security file. Camarda asserts that he was never asked for such a release until 1991, only weeks prior to the suspension of his benefits. Centennial, on the other hand, claims that it made repeated attempts to secure an authorization since 1985, when Camarda reapplied for Social Security benefits. Matthews Aff. ¶ 23. For example, Centennial cites to a letter dated February 28, 1985, when Camarda wrote to Centennial that "[m]y wife and I feel that the authorization to obtain and disclose insurance claim information you're asking me to sign is too broad a statement." Matthews Aff. ¶ 24. Again, in a letter dated

April 15, 1985, Camarda wrote to Centennial "[i]n response to your letter of March 8, 1985, I had consulted with an attorney and he has advised me ... all authorizations have been taken care of while the claim was pending. Therefore, I shouldn't be asked for any more authorizations." Matthews Aff. ¶ 24 and Ex. 6.

Centennial also claims that it made repeated attempts through personal interviews, telephone calls, and correspondence to obtain the authorizations from Camarda and his respective attorneys. Matthews Aff. ¶ 25. Camarda admits that Centennial sent a questionnaire every year or two for his doctor to fill out regarding whether he was receiving any other benefits. Camarda Dep. at 116. Out of embarrassment from having an adjudicated mental impairment, Camarda refused to answer the portion of the questionnaire relating to benefits and further failed to inform his doctor that he was receiving Social Security disability, even though the doctor was required to sign the questionnaire. Camarda Dep. at 117. In addition, Equifax Services, an agent of Centennial, repeatedly met with Camarda in 1991 and attempted to obtain authorizations from him and to ascertain whether he had received any Social Security benefits since 1983. Matthews Aff. ¶ 25; Camarda Dep. at 118. Among other measures, Centennial also sent letters to Camarda dated March 8, 1985, August 8, 1990, and February 6, 1991, requesting that Camarda sign the release authorizations. Matthews Aff. ¶ 25. In addition, Equifax sent Camarda a letter, dated December 21, 1988, providing Camarda a Social Security authorization and requesting that he sign it. Matthews Aff. ¶ 25. Camarda's counsel, in turn, sent four separate letters, dated January 29, 1991, February 14, 1991, August 20, 1991, and September 8, 1992, refusing to provide said authorizations. Matthews Aff. ¶ 25.

Because Camarda refused to provide these authorizations, Centennial stopped making payments to plaintiff, and has refused to pay Camarda any additional benefits under the Plan. P's 3g Stmt. ¶ 7, 8. Plaintiff, however, claims that the documents in Centennial's file

---

1. Camarda did not explain, however, why he did not report the award to the extent that he applied for and received Social Security benefits on the basis of a physical impairment as well.

shows that such authorizations were never requested until January 1991, the same month Centennial terminated the benefits. Birzon Aff. ¶ 32, Ex. K, Ex. L, at 50. Camarda stated that he never actually saw an authorization form until 1991, when Equifax went to his home to obtain his signature. Camarda Dep. at 121. At the time, he refused to sign it on the belief that there was nothing in the Summary Plan Description requiring him to sign such an authorization. Camarda Dep. at 121. Plaintiff claims that upon receipt of the request, he immediately forwarded the authorization to his attorney who contacted Centennial in an effort to resolve the matter. Birzon Aff. ¶ 33 and Ex. M. Centennial, however, refused to reinstate the benefits and to date has not. *Id.*

On February 22, 1991, Centennial informed Camarda by letter that it was going to suspend Camarda's benefits until he provided the Plan with an authorization to verify Social Security benefits paid to him or his family. Matthews Aff. ¶ 29. Plaintiff refers to this conduct by the Plan as a "termination of benefits," while the defendants employ the phrase "temporary suspension." The correspondence at issue, which was addressed to Michael A. DeMicco, Esq. (plaintiff's attorney at that time), reads in pertinent part:

> In response to your letter of February 14, 1991, we feel we have the right to obtain this information to verify if Mr. Camarda's claim was denied or benefits awarded by the Social Security Administration.
> *We are writing to advise that no further benefits can be approved until we receive verification from the Social Security Administration.* Also, please inform Mr. Camarda that this could affect his deferred benefit after age 65.

Matthews Aff. Ex. 12 (emphasis added).

Plaintiff commenced this ERISA action in early 1993 seeking compensatory and declaratory relief, as well as punitive damages and attorney's fees. Centennial claims that as a result of Camarda's failure to inform the Plan that he was receiving Social Security benefits, the Plan overpaid Camarda approximately $57,593 and that it would continue to suspend benefits until the overpayment was resolved. At a discovery conference held on

August 5, 1993, Magistrate Judge Michael Orenstein ordered the plaintiff to provide an authorization to the Social Security Administration concerning his disability insurance benefits status. Notwithstanding its receipt of the requested authorization through discovery in this action, the Plan has not reinstated plaintiff's benefits.

### B. *Relevant Provisions of the Plan Documents*

In defending its decision to suspend plaintiff's benefits, Centennial relies on certain Plan language that allows it to set off from Plan payments any income received from Social Security. Specifically, the Plan provided in Section A. II. that:

> The benefit payable for any monthly period of total disability, or portion thereof for which a monthly benefit is payable on the part of the LTD, determined in accordance with Paragraph I above, shall be reduced by the amount of any *Other Income Benefit* as defined in Paragraph IV of the Definitions as set forth in the Plan of Insurance, available to the Employee for such period.

Birzon Aff., Ex. F, at 5 (emphasis added). Paragraph IV of the Definitions portion of the Plan went on to provide that:

> The term "Other Income Benefits" as used herein means income benefits available under ...
> (d) The Federal Social Security Act together with all amendments thereto, including benefits thereunder to or for any and all dependents (as therein defined) of the Employee *on account of the Employee's disability,* but not including any increase in benefits available to the employee or to or for any and all dependents *on account of the Employee's disability* as a result of amendment of such Act.

Birzon Aff., Ex. F, at 2 (emphasis added).

The Plan was amended effective January 1, 1982. The new definition of "Other Income Benefits" now includes benefits received under:

> (d) The Federal Social Security Act together with all amendments thereto, including benefits thereunder to or for any and all dependents (as therein defined) of

the Employee, but not including any increase in benefits available to the Employee or to or for any and all dependents as a result of amendment of such Act.

Birzon Aff., Ex. H and I. Absent from the amended Plan is the language "on account of the Employee's disability" as underscored in the pre–1982 version.

The Plan also conditioned payment of benefits under the Plan upon receipt by the Company of ... evidence satisfactory to the Company that the Employee has made application for all Other Income Benefits available to him and has furnished all required proofs for such Other Income Benefits. Birzon Aff., Ex. H and I, at 7.

The Plan further provided that:

Successive periods of total disability separated by less than three consecutive months of continuous active work on full-time shall be considered one period of total disability unless the subsequent total disability is due to an injury or sickness entirely unrelated to the cause of the previous total disability and commences after return to active work on full-time.

**For the purposes of the insurance under this Part, all injuries sustained in connection with any one accident shall be considered as one injury and the same and all related sickness shall be considered as one sickness.**

Birzon Aff., Ex. H and I, at 10 (emphasis added).

In addition, Plan participants were given a Summary Plan Description, which provided an overview of the benefits provided under the Plan. The Summary Plan Description provides on page 5 that:

If you become totally disabled ... the monthly benefit payable for a full month of such disability will be 60% of your basic monthly salary or wage ... *reduced by the amount of any Other Income Benefits (see "Definitions") for which you may be eligible whether or not you apply for and receive them.*

Matthews Aff., Ex. 2 (emphasis added). The Summary Plan Description defines "Other Income Benefits" on page 9 as including "Social Security benefits for which you and your dependents are eligible including both disability and retirement benefits...." *Id.* Like the amended Plan, the language in the Summary Plan Description does not include the language "on account of the Employee's disability."

Moreover, the Summary Plan Description defined "successive disabilities" as follows:

Successive periods of disability separated by less than 3 consecutive months of full time active work are considered as one period of total disability unless the later disability is due to an injury or sickness entirely unrelated to the causes of the earlier total disability.

**All injuries resulting from any one accident shall be considered as one injury and all related sicknesses shall be considered one sickness.**

*Id.* (emphasis added).

Finally, the Summary Plan Description provides on page 11 that to obtain benefits under the Plan, the claimant "must apply for any Other Income Benefits (see "Definitions") available to you and **the Insurance Company must be notified of Other Income Benefits payable."** *Id.* (emphasis added).

Although the Plan does not refer to any limitations for mental impairments, the Summary provides that "[m]onthly disability benefits for total disability due to mental or emotional disease or disorder will be payable up to two years whether or not you are hospitalized. If, at the end of the two year period, you are confined in a Hospital, monthly disability benefits will continue as along as you remain confined." Birzon Aff., Ex. H and I, at 7.

Relevant to the arguments raised in this action, the Plan also provides in a section titled "Modifications," at page 15 that:

This Policy may be modified from time to time by agreement of the Company and the Employer without the consent of Employees covered hereunder, *provided that no change in the provisions of this policy shall reduce the amount of any benefit to which an employee shall be entitled on account of loss occurring prior to the effective date of such change.*

Birzon Aff., Ex. H and I, at 15 (emphasis added).

## DISCUSSION

### I. STANDARDS GOVERNING MOTIONS FOR SUMMARY JUDGMENT

Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Under the law of the Second Circuit, a district court must weigh several considerations in evaluating whether to grant a motion for summary judgment with respect to a particular claim. *Gallo v. Prudential Residential Servs., L.P.*, 22 F.3d 1219, 1223 (2d Cir.1994) (internal case citations omitted). First, the moving party carries the burden to demonstrate that no genuine issue respecting any material fact exists. *Id.* (citations omitted). Second, all ambiguities and inferences must be resolved in favor of the non-moving party. *Id.* Third, the moving party may obtain summary judgment by showing that no rational jury could find in favor of the non-moving party because the evidence to support its case is so slight. *Id.* Finally, the trial court's duty is confined to issue-finding and does not extend to issue-resolution. *Id.*

In evaluating the above considerations, a court must be mindful of whether the purported factual dispute is material, because "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

### II. PREEMPTION OF STATE LAW CLAIMS UNDER ERISA

Before evaluating the substantive claims under ERISA, the Court must first address the claims in the amended complaint to the extent that they relate to state law causes of action. In this action, the parties do not dispute that the Plan is an employee welfare benefit plan within the meaning of the Employees' Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.* The amended complaint, however, sets forth only four "counts": one for declaratory judgment, one for breach of contract for disability benefits, one for punitive damages and one for attorneys' fees.

■ It is well-settled that ERISA preempts state law claims and causes of actions. *See Pilot Life v. Dedeaux*, 481 U.S. 41, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987). ERISA itself contains a broad preemption clause stating that its provisions "supersede any and all State laws insofar as they may now or thereafter relate to any employee benefit plan." 29 U.S.C. § 1144(a). In *Dedeaux*, the Supreme Court announced unequivocally that the civil enforcement provisions in ERISA were the exclusive vehicle for actions by ERISA-plan participants asserting improper processing of a claim for benefits. 481 U.S. at 52, 107 S.Ct. at 1555; *see also Smith v. Dunham–Bush, Inc.*, 959 F.2d 6, 8 (2d Cir.1992); *Aetna Life Ins. Co. v. Borges*, 869 F.2d 142, 146–47 (2d Cir.), *cert. denied*, 493 U.S. 811, 110 S.Ct. 57, 107 L.Ed.2d 25 (1989). To the extent plaintiff relies on state law causes of action to challenge Centennial's decision to withhold benefits, therefore, those claims are preempted.

■ The Court finds, however, that Camarda does state viable claims under ERISA. Section 1132 of ERISA provides that a plan participant may bring a civil action "to recover benefits due him under the terms of his plan, ... or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). Because the amended complaint bases jurisdiction under ERISA and the relief sought falls in part under the available ERISA remedies, the Court interprets plaintiff's first cause of action as an ERISA claim for declaratory judgment to clarify his rights, as provided in ERISA § 502(a), 29 U.S.C. § 1132(a).

As noted above, therefore, any state law claims giving rise to a cause of action for the recovery of disability benefits are preempted and will be analyzed solely under ERISA and the case law interpreting it.

### III. CLAIMS FOR DENIAL OF BENEFITS UNDER ERISA PLANS

#### A. *Standard of Review for Denial of Benefits*

■ ERISA does not specifically address the appropriate standard of review of benefits decisions by insurance providers. *Van-Volkenburg v. Continental Casualty Co.,* 944 F.Supp. 198, 200 (W.D.N.Y.1996). In *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 956–57, 103 L.Ed.2d 80 (1989), however, the Supreme Court held that "a denial of benefits challenged under [ERISA] is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Therefore, unless the Plan explicitly reserves discretion for the Plan administrator to interpret or construe the terms of the Plan, Centennial's decision to withhold Camarda's benefits under the Plan will reviewed de novo. As Centennial does not contest that de novo review applies, and as a review of the terms of the Plan reveals no indicia of discretion in conferring benefits, the Court will proceed with that standard.

#### B. *Centennial's Suspension of Camarda's Benefits*

Camarda challenges Centennial's refusal to continue providing him with disability benefits, whether characterized as a suspension or a termination of benefits, on the grounds that (1) the Plan language does not allow set-offs for the Social Security disability benefits he received; (2) Centennial had no contractual right to demand an authorization to review Camarda's Social Security file; and (3) Centennial wrongfully terminated his benefits by failing to provide proper notice of the suspension. Centennial, on the other hand, claims that (1) both the Plan language and the terms of the Summary Plan Description allowed it to set off from Plan payments *any* Social Security disability benefits received by Plan participants; (2) Centennial was justified in seeking the authorization because of Camarda's lack of cooperation in supplying the Social Security information as required

under the Plan; and (3) Centennial provided proper notice of the suspension.

##### 1. *The Plan Summary Governs the Rights of the Parties*

■ The dispute regarding Centennial's ability to set off the benefits Camarda received from the Social Security Administration arises from certain language in the terms of the Plan. The pre–1982 Plan, which was in effect when Camarda began receiving Plan benefits, provided that disability benefits would be "reduced by the amount of any Other Income Benefit," and further defined "Other Income Benefit" to include Social Security benefits received "on account of the Employee's disability." After the Plan was amended in 1982, however, the definition of "Other Income Benefit" was revised to delete any reference to "on account of the Employee's disability," and referred simply to reductions for Social Security benefits, without any qualifications. In addition, Camarda received a summary description of the pre–1982 Plan, which provided that Centennial may set off from disability benefits "Social Security benefits for which you and your dependents are eligible including both disability and retirement benefits."

Plaintiff argues that Centennial is bound under the terms set forth in the Plan prior to its amendment in 1982, and further, that the only Social Security benefits that could be offset were those that related specifically to the exact injuries for which he received benefits under the Plan. Defendant, on the other hand, asserts first, that Camarda's rights and obligations under the Plan are governed by the broader language of the Summary Plan Description, and second, that regardless of which document is used to ascertain the rights of the parties, the Plan language allows it to offset any Social Security award given to Camarda. Based on these arguments, the threshold issue before the Court is which document is to govern the rights and obligations of the parties to this action.

■ Under the law of the Second Circuit, when the terms of a plan and those of a plan summary conflict, it is the plan summary that controls. *Heidgerd v. Olin Corp.,* 906 F.2d 903, 907 (2d Cir.1990). This general

rule arises from the requirement under ERISA that the administrator of an employee benefits plan distribute a summary plan description ("SPD") to beneficiaries under an ERISA plan. *Id.* (citing 29 U.S.C. § 1022). This SPD must reasonably apprise beneficiaries of their rights and obligations under the Plan. 29 U.S.C. § 1022(a)(1); *Pompano v. Michael Schiavone & Sons, Inc.,* 680 F.2d 911, 914 (2d Cir.), *cert. denied,* 459 U.S. 1039, 103 S.Ct. 454, 74 L.Ed.2d 607 (1982). Because of the intent of ERISA in requiring SPDs, ERISA contemplates that the summary will be an employee's primary source of information regarding his or her employment benefits, and employees are entitled to rely on the descriptions contained in the summary. *Heidgerd,* 906 F.2d at 907.

Not surprisingly, plaintiff argues that in certain circumstances, a summary description should not trump or modify the language in the full policy document. Specifically, plaintiff relies on *Bright v. SKW Alloys Group Insurance Plan,* 823 F.Supp. 428 (W.D.Ky.1993) as support for his claim that summary plans cannot improperly modify the rights and obligations under an existing benefit plan. In *Bright,* the decedent was accidentally killed while working for SKW Alloys. The decedent's spouse subsequently brought an ERISA cause of action claiming that the plan administrator improperly denied her accidental death benefits available under the plan. *Id.* at 429–430. The defendants argued that because the summary plan description omitted reference to accidental death benefits, the summary had modified the plan and was the controlling document. *Id.* at 430. Defendants in *Bright* relied on the Sixth Circuit's decision in *Edwards v. State Farm Mutual Automobile Insurance Co.,* 851 F.2d 134, 136 (6th Cir.1988), which like the Second Circuit's decision in *Heidgerd,* held that when a conflict arises between a plan and a plan summary, the terms of the summary control. The court in *Bright,* however, distinguished *Edwards* on its facts. The court found that the purpose of the *Edwards* rule was to prevent the unfairness that would flow from providing beneficiaries with a simplified description of the plan benefits, allowing the beneficiaries to rely on those terms, and then not abiding

by those terms. *Bright,* 823 F.Supp. at 431. The Court in *Bright,* finding that the actual plan terms governed, noted that the plaintiff had read and relied on the terms of the plan itself and not the summary plan, which omitted coverage for accidental death. The court was also persuaded by the fact that the SKW summary plan contained a caveat on the last page that provided that application of the plan would be governed by the provisions in the policy. *Id.* at 432.

In the present case, however, there is no indication that Camarda ever read or relied on the full terms of the Plan document as the plaintiff did in *Bright.* For example, in his deposition, Camarda stated that he acted solely on what he believed his rights were according to his review of the "booklet" provided relating to disability benefits. Camarda Dep. at 113. In addition, unlike in *Bright,* there is no savings clause in the summary that refers to the Plan in the event of any conflict. The only possible language in the summary plan that could be construed as a deferral to the Plan itself is a statement on page 1 of the summary stating that "[t]o understand your benefits better you should read this booklet in its entirety and keep it for future reference. The complete terms of the plan are set forth in the actual policy." Matthews Aff., Ex. 2, at 1. Such language does not rise to the level of the language present in any of the summaries scrutinized by other courts. *See, e.g., Sturges v. Hy–Vee Employee Benefit Plan and Trust,* 991 F.2d 479, 481 (8th Cir.1993) (finding that where the summary explicitly stated that if a conflict arises with the plan, the plan should control); *Glocker v. W.R. Grace & Co.,* 974 F.2d 540, 542 (4th Cir.1992) (finding that the plan language controlled where summary expressly stated that actual policy will be used to resolve any questions about plan benefits).

The language in the summary at issue here, on the other hand, is silent as to which document to follow in the event of a conflict. Moreover, the language clearly instructs plan participants to read and rely on the *booklet* to understand their rights. As to the remaining language, it is axiomatic that the full terms of the plan are contained in the actual policy and not the summary of it. Accord-

ingly, because there is nothing to manifest the intent that the Plan terms should control over the summary, and because Camarda himself relied on the terms of the summary, the Court finds that the terms of the Summary Plan Description control the rights and obligations of the parties.

### 2. The Summary Plan Allows Centennial to Offset Social Security Benefits

■ The language of ERISA does not provide the courts with guidance as to how group insurance and disability plans are to be interpreted. *VanVolkenburg*, 944 F.Supp. at 201. Federal courts, however, have developed a federal common law to help guide such interpretation. *Id.* (citing *Dedeaux*, 481 U.S. at 56–57, 107 S.Ct. at 1558); *see also Masella v. Blue Cross & Blue Shield of Conn.*, 936 F.2d 98, 107 (2d Cir.1991); *Burnham v. Guardian Life Ins. Co. of America*, 873 F.2d 486, 489 (1st Cir.1989). In particular, the language in an insurance policy governed by ERISA should first be given its plain meaning, and then any ambiguous terms should be strictly construed against the insurer. *Masella*, 936 F.2d at 107. This presumption favoring the insured, however, is a principle of last resort, to be invoked only when there is no other indication of the intent of the parties. *O'Neil v. Retirement Plan for Salaried Employees of RKO General, Inc.*, 37 F.3d 55, 61 (2d Cir.1994) (citing *Record Club of America, Inc. v. United Artists Records, Inc.*, 890 F.2d 1264, 1271 (2d Cir.1989)).

The Court finds that the plain language of the summary required Camarda to disclose his Social Security disability benefits to Centennial. In particular, the summary required that participants inform Centennial of any Social Security disability benefits that the participant received. Indeed, such proof was a condition precedent to payment under the Plan.[2] Centennial attempted to monitor whether such awards were made by sending questionnaires to Camarda every year or two.[3] When Camarda failed to answer these questionnaires accurately, Centennial began to seek an authorization to review Camarda's Social Security file. Notwithstanding Camarda's obligation to report the award to Centennial, however, he failed to cooperate in providing the authorization until after this litigation began. The Court finds, therefore, that because Camarda failed to satisfy his disclosure obligations under the Plan, Centennial acted within the terms of the Plan in suspending or even terminating Camarda's benefits until a full investigation of the Social Security award and repayment of the nearly five years of benefit overpayments made by Centennial.

### 3. The Plan Language Also Permits a Setoff

■ Even if guided by the language in the Plan itself, the Court finds that the Plan language also required Camarda to notify Centennial of the Social Security award. A review of the actual policy is also merited to address plaintiff's arguments regarding the priority of the language in the summary. First, regardless of the alleged language conflict between the documents, plaintiff asserts that to be consistent with ERISA's goals, the Court should apply the language most favorable to the plan participant. Plaintiff points out that the rule allowing summary plans to supersede actual policies was designed to protect employees, and should not be extended to serve as a sword for employers. Second, plaintiff raises the argument that the summary plan cannot control if it constitutes an improper modification of the terms of the Plan by reducing Camarda's available benefits. Finally, the Court takes note of the Fourth Circuit's decision in *Hendricks v. Central Reserve Life Insurance Company*, 39 F.3d 507 (4th Cir.1994), which found that where the summary plan description and the plan itself do not directly conflict, there is no

---

**2.** As noted earlier, the Plan conditioned payment of benefits "upon receipt by the Company of ... evidence satisfactory to the Company that the Employee has made application for all Other Income Benefits available to him **and has furnished all required proofs for such Other Income Benefits.**" Birzon Aff., Ex. H and I, at 7 (emphasis added).

**3.** Camarda admitted to crossing out the question as to whether he received Social Security benefits because he did not want to acknowledge that he had a mental impairment. Camarda Dep. at 115. In addition, Camarda never informed his doctor, Dr. Foreman, that he was receiving Social Security, and the doctor signed off on Centennial's questionnaire. *Id.* at 116.

prohibition against review of the official plan itself for a fuller understanding of the plan's terms. *Id.* at 512. The court went on to note that "in those circumstances the plan is the controlling document for determining the scope of the benefits provided." *Id.*

As noted earlier, the Plan language indicated that disability benefits conferred under the Plan would be reduced by "any Other Income Benefit," which included Social Security benefits awarded "on account of the Employee's disability." Plaintiff contends that this language is ambiguous because it is unclear whether a participant is subject to an offset only for Social Security received for the same disability that he received benefits for under the Plan, or whether a participant is subject to an offset for any Social Security disability benefit. In this regard, he claims that the award he received from Social Security was unrelated to the disability under the Plan because the Social Security award related to a mental impairment.[4] The defendant, on the other hand, asserts that both the summary and the Plan are consistent and unambiguous and allow an offset for any Social Security disability benefit.

The Court finds that regardless of which interpretation the Court follows, Camarda was required to report his Social Security award to Centennial because the award was "on account of [his] disability." The facts of this case reveal that the Social Security benefits awarded in 1986 related to the injuries for which Camarda received benefits from Centennial. First, Camarda in his deposition conceded that when he reapplied for Social Security benefits in 1984, he only applied for benefits resulting from injuries to his foot, hip and back, just as he had before. Camarda Dep. at 90. The decision of the ALJ also reflects this fact. *See* ALJ Decision, at 2. Second, although the ALJ was precluded from finding a disability based on the initial impairments from the hip, foot and back

injuries,[5] the ALJ could consider evidence of disability from these injuries beginning from the day after the first denial of Social Security benefits. ALJ Decision, at 3. Reviewing the evidence presented of injury since 1983, therefore, the ALJ noted that Camarda had pain in the hip and the back, and that later back scans revealed spine damage that had gone undetected prior to 1983. *Id.* at 4. In addition, the ALJ noted that Camarda's doctors had found he suffered from anxiety and depression. Moreover, the ALJ considered evidence that Camarda had suffered chronic lower back pain since his on-the-job accident in 1981. *Id.* at 5. Consultative examinations ordered by the ALJ further indicated that Camarda was unable to lift and carry more than five pounds and that there was evidence of an anxiety-related disorder. *Id.* at 6. Accordingly, the ALJ awarded Camarda benefits retroactive to June 17, 1983, the date immediately following the prior ALJ's denial decision, and concluded that "from a physical standpoint alone, the claimant has lacked the residual functional capacity to perform either his past relevant work or any other type of substantial gainful activity contemplated in [the Social Security Regulations]." *Id.*

The language and analysis of the ALJ's decision, therefore, reveals that the Social Security award was made on the basis of impairments related to the hip, foot and back injuries, for which Camarda also received Plan benefits. These impairments were manifested in several ways, including, *inter alia,* the inability to lift heavy weights, back pain, anxiety and depression. Although the indicia of Camarda's disability may have changed over the years, the cause (the on-the-job-accidents) and the result (total disability) are the same. Moreover, the Plan specifically states that multiple injuries arising from the same accident are to be considered as one successive injury when ascertaining disability:

---

4. As discussed previously, the ALJ's decision reflects that both physical impairment and mental impairment formed the basis of the 1986 Social Security award. Moreover, Camarda's claim that mental impairments were not covered under the Plan is erroneous, since the Plan Summary specifically provides for coverage, albeit limited to two years absent hospitalization.

5. The ALJ was barred on the basis of res judicata from awarding disability benefits for impairments considered in the previous denial of benefits.

For the purposes of the insurance under [the Plan], all injuries sustained in connection with any one accident shall be considered as one injury.

Birzon Aff., Ex. H and I, at 10. The identical language was included in the summary plan description. *See* Matthews Aff., Ex. 2. Furthermore, at a minimum, Camarda's mental impairments relate to his disability to the extent they arose from his inability to work and function as he did prior to his accidents. As a consequence, the Court concludes that the award of Social Security disability benefits was "on account of the Employee's disability," that Centennial was entitled to deduct the award from Camarda's benefits, and that Camarda should have reported to Centennial that he received the award so that it could offset such benefits from the benefits it was distributing to the Camarda family.

In addition, the Court rejects plaintiff's arguments that Centennial could not suspend his benefits because of his refusal to supply the Social Security authorizations. As noted above, Camarda had an obligation under the Plan to disclose to Centennial any Social Security award relating to his disability. Once Centennial had this information, it could make the appropriate deductions as described in the Plan. Because Camarda obstructed Centennial's ability to ascertain if he was receiving Social Security benefits, it had no other choice but to suspend the payment of benefits until it obtained the information it needed to perform its rights and obligations under the Plan, and the further right to seek reimbursement of the overpayments it made. *See also Christiansen v. Metropolitan Life Insurance Co.*, No. 89–CV–761, 1990 WL 209650, at * 1 (N.D.N.Y. Dec. 14, 1990) (finding that under either a de novo or an arbitrary and capricious standard of review, the decision of a plan administrator to terminate benefits was proper after the participant failed or refused to provide proof of her disability as required under the disability plan in issue).

The Court concludes, therefore, that either under the summary plan or the Plan itself, Centennial had the right to set off the benefits Camarda received from Social Security,

Camarda had a duty to inform Centennial of the award, and Camarda's failure to provide this information, either on the questionnaires or through an authorization, was grounds for Centennial to suspend his benefits. In addition, Centennial has the right to recoup any overpayment it made to Camarda on the basis of Camarda's breach of his obligations under the Plan.

### C. *Notice Due for Suspension of Benefits*

◼ Although the Court finds that Centennial was entitled to set-off plaintiff's Social Security benefits from his disability benefits under the Plan, the Court must also consider plaintiff's allegations that Centennial failed to give proper notice that his benefits would be reduced or withheld. Camarda argues that Centennial was required to give written notice of any suspension pursuant to Section 2560.503–1(f) of the Code of Federal Regulations ("CFR").

ERISA does not expressly provide a notice requirement for termination of benefits conferred under an ERISA plan. It does, however, provide a detailed mechanism for the processing of benefits claims and sets certain minimum requirements for the provision of notice to a beneficiary when a plan administrator denies a claim for benefits in whole or in part. ERISA § 503, 29 U.S.C. § 1133. The contents of a notice of denial of benefits, however, is specified in Department of Labor regulations, codified at 29 C.F.R. § 2560.503–1(f). Under the regulations, the plan administrator must provide written notice of a benefits claim and the notice must include: (1) the reason for the denial; (2) reference to the plan provisions on which the denial is based; (3) a description of any additional information necessary to perfect the claim and an explanation of why such material is necessary; and (4) appropriate information as to the steps to be taken if the participant or beneficiary wishes to submit his or her claim for review. 29 C.F.R. § 2560.503–1(f).

The purpose of this provision is to ensure that a participant who was denied benefits can receive a meaningful review of his claim by pinpointing the issues to address. *Wolfe v. J.C. Penney Co.*, 710 F.2d 388, 392 (7th Cir.1983). Thus, a notice of benefits denial is inadequate if it does not provide the benefi-

ciary and the courts with a sufficiently precise understanding of the grounds for the denial to permit a realistic possibility of review. *Halpin v. W.W. Grainger, Inc.,* 962 F.2d 685, 689 (7th Cir.1992). In assessing whether notice was adequate as required under the CFR, therefore, the courts have found that precise compliance with the regulations is not necessary as long as the plan administrator has substantially complied with such regulations and has provided the beneficiary with sufficient information to appeal the denial. As such, the cases finding defective notice of denial of benefits focus on whether the plaintiffs were apprised of why their benefits were being altered and what they could do to correct the deficiencies of their benefit claims. *See Dawes v. First UNUM Life Insur. Co.,* 91–CV–103, 1992 WL 350778, at *2 (S.D.N.Y. Nov. 13, 1992) (citing *VanderKlok v. Provident Life and Accident Insur. Co.,* 956 F.2d 610, 616 (6th Cir.1992); *Grossmuller v. International Union, Local 813,* 715 F.2d 853, 858 (3d Cir.1983); *Wolfe,* 710 F.2d at 392; *Richardson v. Central States, Southeast & Southwest Areas Pension Fund,* 645 F.2d 660, 665 (8th Cir.1981)).

In the present action, the notice sent to Camarda's attorney on February 22, 1991 informing him that his benefits would be suspended read as follows:

In response to your letter of February 14, 1991, we feel we have the right to obtain this information to verify if Mr. Camarda's claim was denied or benefits awarded by the Social Security Administration.

We are writing to advise you that no further benefits can be approved until we receive verification from the Social Security Administration. Also, please inform Mr. Camarda that this could affect his deferred benefit after age 65.

Should you have any further questions concerning this matter, please let us know promptly.

Matthews Aff., Ex. 12. This letter came in response to a February 14, 1991 letter from Camarda's attorney to Centennial, informing Centennial that "[a]lthough it is clear that the Pan Am LTD Plan permits you to reduce disability benefits by the amount of any Social Security award, it is not clear as to whether you are entitled to any authorization . . . [and] Mr. Camarda continues to feel that the information contained in the Social Security Administration file is confidential . . . [and] he is unwilling to provide the authorization." Matthews Aff., Ex. 12.

This correspondence suggests that Camarda was on notice that (1) the reason for the adverse action was Camarda's refusal to provide the necessary information regarding proof of Other Income Benefits, including an authorization to review the Social Security file; (2) the information needed, i.e., an authorization to review Camarda's Social Security file or other information regarding whether or not he received a Social Security award; and (3) the reason why the information was needed, i.e., to verify whether Camarda was awarded Social Security disability benefits such that Centennial could deduct such amounts as required under the Plan. Although the notice could be construed as failing to include the basis in the Plan for suspending benefits, it specifically notes that it is in response to Mr. DeMicco's February 14, 1991 letter, which states that "it is clear that the Pan Am LTD Plan permits you to reduce disability benefits by the amount of any Social Security award." Matthews Aff., Ex. 12. The basis of Centennial's request for the authorization, however, is not from a specific Plan provision and could not be pointed out in the notice letter. Rather, as the Court has concluded, Centennial's right to seek such authorization stems from Camarda's duty to provide proof of Other Income Benefits. Finally, the failure of the letter to specify the steps to obtain review of the decision is irrelevant because neither party has raised the issue of exhaustion of administrative remedies and the letter stated that Camarda could avoid the suspension by providing the required information, which he did not. Instead, he sought review by this Court and a declaration that he did not have to provide the authorization and that his benefits under the Plan must continue.

Even if the letter did not provide adequate notice, however, the remedy for failure to provide adequate notice is not an automatic entry of judgment in favor of the insured. *George v. First UNUM Life Insur. Co.,* No.

93–CV–2916, 1995 WL 231254, at *2 (S.D.N.Y. April 18, 1995). Rather, the plaintiff must receive an opportunity to fully and fairly present his claim. *Id.* In this case, however, the Court has had the opportunity to review the merits of each parties claims and to assess the facts at issue. Based on these facts, the Court finds that the notice given to Camarda was not defective. First, Camarda was apprised of the basis for the withholding of benefits (whether a termination or suspension is irrelevant) because of Camarda's failure to provide information regarding Social Security benefits as required under the Plan. Second, Camarda was notified that to remedy the suspension, he need only supply the information necessary to verify whether or not he was receiving such benefits. Third, neither party has raised the argument that Camarda did not exhaust his administrative remedies in pursuing his claims in Court. Rather, Camarda instituted this action specifically to receive judicial review of his rights under the Plan, which the Court has undertaken.

The Court finds, therefore, that plaintiff's claim that he did not receive adequate notice of the suspension or termination of his benefits is without merit. Camarda was put on direct notice of the reason for the suspension and the steps he could take to rectify it, and instead of opting to pursue a remedy through administrative proceedings, he sought this Court's decision as to his rights.

*D. Attorneys' Fees and Punitive Damages*

■ Because the Court finds that plaintiff's claims are without merit, plaintiff's claims for attorneys' fees and punitive damages are denied.

### CONCLUSION

For the foregoing reasons, the Court orders that defendant's cross-motion for summary judgment is granted, that plaintiff's motion for summary judgment is denied, and that the Clerk of the Court is directed to mark this action as closed.

SO ORDERED.