Mary G. **KIRKPATRICK, Esq., Legal Guardian for Jane Doe I, and Mary Kehoe, Esq., Legal Guardian for Jane Doe II, Plaintiffs,**

v.

**MERIT BEHAVIORAL CARE CORPORATION, dba Merit Behavioral Care Systems Corporation, Defendant.**

No. 2:97–CV–203.

United States District Court,
D. Vermont.

May 19, 2000.

---

Robert E. Manchester, Manchester Law Offices, P.C., Burlington, VT, Bryant Welch, Bryant L. Welch, J.D., Ph.D. & Associates, Potomac, MD, for Plaintiffs.

Peter B. Joslin, Jeffry W. White, Theriault & Joslin, Montpelier, VT, Jeffrey J. Bouslog, Oppenheimer, Wolff & Donnelly LLP, St. Paul, MN, for Defendant.

### ORDER AND OPINION

SESSIONS, District Judge.

On June 27, 1997 Mary Kirkpatrick, Esq. and Mary Kehoe, Esq. brought this civil action on behalf of two teenage girls, Plaintiffs Jane Doe I and Jane Doe II,

against Defendant Merit Behavioral Care Corporation ("Merit") for first party bad faith denial of medical insurance benefits.

On December 29, 1999 Merit filed a Motion to Dismiss Plaintiffs' claims for failure to establish, as a matter of law and within the time allotted by the Court, the necessary breach of contract component of Plaintiffs' bad faith claims (Paper 143). On January 6, 2000 Plaintiffs filed an Opposition to Merit's Motion (Paper 145). Further briefing of the issue took place in Plaintiffs' and Defendant's January 18, 2000 Omnibus Briefs on all outstanding motions (Papers 150 and 151 respectively), which were submitted pursuant to the request made by the Court during the December 7, 1999 status conference.

For the reasons set forth below, the Court **GRANTS** Defendant's Motion to Dismiss all claims brought by both Jane Doe I and Jane Doe II. Consequently, all other pending motions, including Defendant's November 8, 1999 Motion for Reconsideration (Paper 122)[1], Defendant's November 18, 1999 Motion to Certify Issue for Interlocutory Appeal (Paper 129)[2], Plaintiffs' January 18, 2000 Motion to Amend (Paper 146), Jane Doe I's January, 18, 2000 Motion for Separate Trial (Paper 147), Plaintiffs' February 11, 2000 Motion for Leave to File Supplemental Memorandum (Paper 153), Defendant's February 28, 2000 Motion to Strike (Paper 156), and Plaintiffs' March 3, 2000 Motion for Continuance (Paper 157), are all **DENIED AS MOOT.**

### I. Facts

#### A. Jane Doe I

In 1995 Jane Doe I, then a teenage girl, suffered from a number of afflictions including substance abuse and sexual trauma related mental health issues. Because her

---

1. The Court orally denied this Motion in a hearing held on November 3, 1999. Although the Court expressed an intent at that time to follow up the oral ruling with a written order, such follow up is no longer necessary.

2. The Court also orally denied this Motion at the November 3, 1999 hearing.

mother was an employee of the State of Vermont, Jane Doe I was covered under a health insurance program known as the "Choice Plus Plan" ("State Plan"). Benefits under the plan were the result of a 1991 contract between the State of Vermont and the Vermont State Employees Association ("VSEA"). VSEA was the exclusive bargaining agent for state employees.

The State Plan provided for up to 56 days residential stay for substance abuse treatment. It did not provide for long term residential treatment of mental health problems. State Plan at 19–21. The State Plan also gave the State the authority to "carve out"—i.e., subcontract—its benefit review and management of mental health and substance abuse matters to a managed care utilization review contractor. The pertinent language is as follows:

> The State may contract with an entity to provide a Pre–Admission Review program, the purpose of which is to insure the quality and appropriateness of inpatient hospital care and residential treatment center care received by plan participants.
>
> Pre–Admission Certification means a professional review by the Pre–Admission Review Contractor to determine in advance of admission the maximum number of days of In–Patient Hospital Care which will be deemed medically necessary for the care or treatment of the patient's condition.

State Plan, at 12.

Pursuant to this "carve out" authority, the State entered into a contract in 1991 with American Biodyne[3] to provide mental health and substance abuse benefits review ("State/Biodyne Contract"). The State/Biodyne Contract expressly stated that it created no third party rights:

> *Third Party Rights*
>
> The parties have not created and do not intend to create by this Contract any enforceable rights in any third party

under this Contract, including, but without limitation, Covered Members. The parties acknowledge and agree that there are no third party beneficiaries to this Contract.

State/Biodyne Contract, attachment D. The contract also stated:

*Terms of State's Benefit Plans*

> Upon availability, but not later than August 1, 1991, State shall provide Biodyne with a copy of the Plan and any other documents or contracts explaining its arrangement with and its benefits provided to Covered Members pursuant to the Plan. Such document shall be for informational purposes only and the terms of any agreement between the State and its Covered Members shall not be made a part hereof. State shall promptly notify Biodyne, in writing of any changes in the Plan relating to this Contract.

State/Biodyne Contract, at 8.

In the Spring of 1995 Jane Doe I was nearing the end of a 56 day residential stay for drug abuse treatment. Jane Doe I's mother, therapist and teacher all requested that longer term care be authorized. Because Biodyne believed it was limited to the specific "carve out" services it had contracted with the State to perform under the State Plan, it was under the impression that it could not authorize treatments that were not provided for in the State Plan. Thus, the requests made on behalf of Jane Doe I were denied.

Upon learning of the situation, Kathryn Callaghan, Vermont's Employee Benefits Director, nevertheless asked Biodyne to extend Jane Doe I's treatment at least by means of a transitional program. Biodyne did this by placing Jane Doe I into the Continuum program, a partial hospitalization program located in the Burlington area. Time in the Continuum program, however, still counted toward the 56 day limited substance abuse residential benefit.

**3.** Biodyne later became Merit, the Defendant in this action.

In an effort to extend Jane Doe I's eligibility further, Ms. Callaghan first retroactively recounted prior residential days as "half-days" to allow for more total days to be authorized, and then she simply authorized residential days beyond the 56 authorized days.

Facing further requests from Continuum staff to authorize long term residential care for Jane Doe I, Ms. Callaghan at that point felt she had to authorize Biodyne to deny further care because it was not a benefit covered by the State Plan.

### B.   Jane Doe II

In 1995, Jane Doe II, much like Jane Doe I, also suffered from a tragic array of afflictions including eating disorders and substance abuse. As a dependent of an employee of the Franklin Central Supervisory Union, she was covered by the Vermont Health Partnership ("VEHI Plan"). The VEHI Plan provided that Blue Cross Blue Shield of Vermont ("Blue Cross") would serve as the Plan administrator. On January 1, 1995 Blue Cross entered into a utilization review agreement with Biodyne that was, for the purposes of this motion, functionally identical to the State/Biodyine Contract outlined in the Jane Doe I scenario described above. The Blue Cross/Biodyne Contract required that Biodyne provide managed mental health/substance abuse services to those covered by the VEHI Plan.

On February 1, 1995, Rebecca Kennedy, Jane Doe II's mental health therapist, recommended residential placement for Jane Doe II for treatment of her depression and related eating disorder. In keeping with the Biodyne contract, Kennedy sought approval from Biodyne before making the referral. Biodyne denied Kennedy's request and instead authorized 12 days at another facility. In subsequent months there transpired a series of situations in which Jane Doe II's examiners were denied various types of authorization by Biodyne. Although these denials form the basis of Jane Doe II's complaint, they are in point of fact superfluous to the Court's ruling today.

### C.   Procedural Background.

On June 27, 1997 Jane Doe I and Jane Doe II brought this suit through their legal guardians alleging tortious breach of contract. They alleged that Merit, in its capacity as a utilization review provider under the State Plan and the VEHI Plan, breached an implied duty not to commit tortious injury to the beneficiaries of those plans.

On December 29, 1999 Defendant filed the Motion to Dismiss presently before the Court. Defendant argues for dismissal from two different perspectives. First, Defendant argues that Plaintiffs have failed to show that there ever was a contractual relationship between Plaintiffs and Merit. Second, Defendant argues that, independent of whether any contractual link can be established between Plaintiffs and Defendant, Plaintiffs have also failed to show how Merit ever committed any breach of the only contract to which it was a party—its contract with the State.

## II.   Discussion

### A.   Summary Judgment Standard

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R.Civ.P. 56(c); *Alexander & Alexander Services, Inc. v. These Certain Underwriters at Lloyd's, London, England,* 136 F.3d 82, 86 (2d Cir.1998) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). The movant bears the burden of showing that no genuine issue of material fact exists. *Gallo v. Prudential Residential Services,* 22 F.3d 1219, 1223 (2d Cir.1994) (citing *Heyman v. Commerce & Indus. Ins. Co.,* 524 F.2d 1317, 1320 (2d Cir.1975)).

All ambiguities must be resolved and all inferences from the facts drawn in favor of the non-moving party. *Matsushita Elec.*

*Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). However, the nonmoving party must rebut the grounds for summary judgment by means of credible evidence and not mere speculation. In sum, "[t]he court must draw all reasonable inference in favor of the non-moving party and only grant summary judgment for the moving party if no reasonable trier of fact could find in favor of the non-moving party." *Vermont Gas Systems, Inc. v. United States Fid. & Guar. Co.*, 805 F.Supp. 227, 231 (1992) citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### B. Vermont Law Applicable

■ This Court has diversity jurisdiction in this action pursuant to 28 U.S.C. § 1332(a)(1) and is thus required to apply Vermont law as to all substantive issues. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). When the state supreme court has not interpreted a matter of substantive law, it is the duty of this Court in a diversity action to anticipate how the state supreme court would interpret the law, and rule accordingly. *Deveny v. Rheem Mfg. Co.*, 319 F.2d 124, 129 (2d Cir.1963) (finding that a federal district court in a diversity case hearing an action based on injuries sustained in Vermont must look to Vermont law and rules of statutory interpretation.) However, the Vermont Supreme Court has produced ample law on the viability of insurance claims and insurance contract interpretation. This Court therefore does not need to take any bold anticipatory steps in ruling today.

4. In contrast to the first party bad faith established in *Bushey*, Vermont law still does not generally recognize third party bad faith claims. *Larocque v. State Farm Insurance Co.*, 163 Vt. 617, 618, 660 A.2d 286 (1995) (there is no insurer good faith duty to third party claimants). This is an important, if peripheral, point given that this entire case

### C. No Contract Existed Between Plaintiffs and Defendant.

■ Plaintiffs have consistently described this action as one of first party bad faith. First party bad faith insurance claims in Vermont are controlled by *Bushey v. Allstate Insurance Co.*, 164 Vt. 399, 670 A.2d 807 (1995). In *Bushey*, the Vermont Supreme Court established first party bad faith as a viable claim in Vermont. In so doing, it adopted the two part *Booska* test for establishing such bad faith. *Id.* at 401, 670 A.2d 807, citing *Booska v. Hubbard Insurance Agency, Inc.*, 160 Vt. 305, 627 A.2d 333 (1993). According to that test, for a plaintiff in a first party bad faith case to prevail, he or she must establish (1) that a breach of the relevant insurance contract took place, and then (2) that the breach was committed either in bad faith or with reckless disregard for the terms of the policy. *Id.*[4]

It is both common sense, and generally understood, that Plaintiffs in these actions must establish breach of contract before proceeding to the bad faith aspect of the claim. *Bushey*, 164 Vt. at 403, 670 A.2d 807. Plaintiffs acknowledged as much in the April 28, 1999 pretrial conference when Plaintiffs' counsel stated:

Usually, in a bad faith/breach of insurance contract case, the plaintiff at some point in time files a motion for summary judgment on the issue of breach of contract, and then thereafter there is something further with regard to willful breach of contract which is usually a triable issue because it's an intent issue.

Transcript of Pretrial Conf, April 28, 1999.

■ Plaintiffs, however, have not met the burden they acknowledged. They have not only failed to demonstrate breach, but more fundamentally, they have

turns on the question of whether Jane Doe I and II were beneficiaries to the State/Biodyne and Blue Cross/Biodyne Contracts. In this opinion, the Court holds that they were not beneficiaries of any kind, neither first nor third. If they had claimed third party beneficiary status, however, they would have had no claim under Vermont law.

failed even to show that a contract exists between them and Defendant. Given the grave nature of Plaintiffs' allegations, and the serious policy implications of bad faith in the managed care industry, this Court was determined to afford Plaintiffs every reasonable opportunity to demonstrate that a contract existed. The Court's patience, however, was to no avail. After careful consideration of all the evidence and legal analysis that has been submitted on the contract question, the Court now definitively concludes that Plaintiffs do not have a contract upon which they may base their claims.

Technically, neither Jane Doe I nor Jane Doe II has ever even *filed* anything with the Court to establish the contract between the two women and Merit. Jane Doe I's single effort to establish that contractual relationship came in Plaintiffs' October 29, 1999 Motion for Partial Summary Judgment on the issue of insurance coverage (Paper 109). However in its November 11, 1999 Order, the Court struck that Motion as out of time. Jane Doe II has not once ventured an argument for how Merit owes contractual responsibilities to her, much less for why Merit might be held to have breached any such responsibilities.

In addition to being struck on procedural grounds, however, Jane Doe I's motion also missed the mark substantively in that it never established a contractual basis for why Merit—rather than the State—should be the object of Plaintiffs' first party suit. In the Motion, Plaintiffs attempted to create this basis by citing, but not applying, the following rules of insurance contract construction: (1) ambiguities should be construed in favor of the insured; (2) reasonable expectations should be evaluated based on the general purpose of the contract; (3) contract language should be construed in its plain, ordinary and popular sense; (4) parties to an insurance contract are bound to its terms when the contract is executed; (5) limitations and exclusions to coverage stated in insurance contracts must be strictly construed for the purpose of providing coverage; (6) coverage exclusions not approved by BISHCA may be voided; and (7) extrinsic evidence may be used to determine whether language in an insurance contract is ambiguous. Plaintiffs' Motion for Partial Summary Judgment, at 1–8.

With all proper respect to these lofty concepts, the Court fails to see how they overcome the plain language of the State Plan and the State/Biodyne Contract. According to the State Plan, the State had the right to subcontract benefit review and management for mental health and substance abuse benefits, which it did. That contract also explicitly limited the amount of inpatient residential time for any covered member to 56 days. Then, according to the express terms of the carve-out State/Biodyne Contract, only the State of Vermont and Biodyine were parties to that contract. No third party beneficiaries were created. So-called "Covered Members," such as Jane Doe I and Jane Doe II, were specifically singled out as being *in*-eligible for third party beneficiary status. By the express terms of the contract, they were ineligible for party status under that contract. They therefore cannot proceed with this claim.

### D. Merit Never Breached Its Contract With The State.

As a final point of clarification concerning the parameters of the State/Biodyne Contract, the Court wishes to mention that it sees no way in which Merit breached its contract with the State. The State/Biodyne Contract was defined as a "carve out" contract, i.e., a contract to perform certain tasks contained in the State Plan. By the very nature of the contract, Merit could not authorize services above and beyond the State Plan. In light of the fact that the Court bases its decision to dismiss on the "no contract" theory, this is a somewhat superfluous point.

What is important, however, is the understanding that according to this ruling,

Plaintiffs did not fail the first "breach of contract" prong of the *Booska* test. They didn't even reach the first prong. The Court wishes to be very clear on this point because under the stringent standards of summary judgment, this case may in fact have been allowed to proceed had Plaintiffs shown this Court that they were first parties to a contract with Merit. This, however, they did not do.

## III. Conclusion

In the end of the day, Plaintiffs simply have not shown the Court that there was a contractual relationship between them and Merit. It is quite possible that Plaintiffs have suffered extensively, perhaps even irreparably, as a result of medical care they did not receive. However, it is this Court's view that if there is a colorable bad faith suit present in these facts, it would be against the insurer, not the entity who, at the request of the insurer, faithfully performs a carved out service.

The Court fully recognizes the enormous public policy implications that are raised by broad versus narrow interpretations of managed care contracts. However, public policy cannot run completely roughshod over time honored principles of contract law. Such a move would, itself, raise other troubling policy concerns. Without reliable rules of contract, our society would not function with the security and efficiency that it does. Here, Plaintiffs are trying to hold Merit responsible for breach of a contract to which it was not a party. Their claims may have been more appropriately made against the parties with whom they had contracts.

Wherefore, the Court **GRANTS** Defendant's Motion to Dismiss.