**Bonnie HAYES, Plaintiff,**

v.

**EQUALITY SPECIALITIES, MNC Stribbons, Inc. and MNC Sourcing Solutions, Inc., Defendants.**

**No. 09 Civ. 7276(VM).**

United States District Court, S.D. New York.

Aug. 20, 2010.

Kenneth Andrew Goldberg, Goldberg & Fliegel LLP, New York, NY, for Plaintiff.

Alan Seife, Coleman & Seife, White Plains, NY, for Defendants.

## DECISION AND ORDER

VICTOR MARRERO, District Judge.

Plaintiff Bonnie Hayes ("Hayes") brought this action against defendants Equality Specialties, Inc. ("Equality"), MNC Stribbons Inc. ("MNC Stribbons"), and MNC Sourcing Solutions, Inc. ("MNC Sourcing").[1] Hayes's complaint (the "Complaint"), asserts claims relating to the termination of her employment by Equality, including: (1) breach of contract, (2) promissory estoppel, (3) unjust enrichment, (4) quantum meruit, and (5) failure to pay wages in violation of New York Labor Law §§ 190–99. Equality has not answered the Complaint or appeared through counsel in this action. Hayes's causes of action against MNC are premised solely on Hayes's claim of MNC's successor liability for Equality's alleged wrongs. MNC now moves for summary judgment, asserting that Hayes has failed to raise a triable issue of fact as to MNC's successor liability. For the reasons stated below, the Court GRANTS MNC's motion.

## I. BACKGROUND

### A. PROCEDURAL HISTORY

On November 6, 2009, after raising the threshold issue of successor liability at the initial conference in this matter, the Court directed MNC to submit a letter-brief explaining its basis for asserting its lack of successor liability. MNC answered the Court's request by letter-brief dated December 4, 2009, which the Court deemed a motion to dismiss the Complaint under Rule 12(b)(6) of the Federal Rules of Civil

---

1. In 2006, MNC Sourcing changed its name to MNC Stribbons. The Court thus refers to MNC Stribbons and MNC Sourcing as "MNC."

Procedure. Hayes responded to MNC's motion by letter dated December 9, 2009 (collectively, the "Letter–Briefs"). The Court then held a hearing on March 16, 2010 (the "Hearing") pursuant to Rule 12(i) of the Federal Rules of Civil Procedure to determine whether, in view of the threshold issue of successor liability, Hayes's factual allegations raised a plausible claim for relief against MNC. At the close of the Hearing, the Court, in accordance with Rule 12(d) of the Federal Rules of Civil Procedure, converted MNC's motion into a motion for summary judgment, accepting a record comprised of the Complaint, the Letter–Briefs, the Hearing transcript (the "Hearing Tr."), and the exhibits admitted at the Hearing. (*See* Hearing Tr. at 82–83.)

The Court also provided the parties with the opportunity to supplement this converted motion with any additional material they considered necessary to complete the record, taking into account what came out at the Hearing, and informed them that upon submission of any such supplemental material the Court would issue a ruling. (*See* Hearing Tr. at 83.) MNC then submitted a memorandum of law with attached exhibits in support of its motion. In opposition, Hayes filed her response memorandum ("Pl. Opp. Br.") along with the Certification of Plaintiff's counsel Kenneth A. Goldberg ("Golberg Certification") with its attached exhibits.

## B. FACTUAL BACKGROUND [2]

### 1. Equality and Hayes

Equality was a manufacturing business with factories in Miami and St. Lucia. From March 2003 through January 2004, Equality employed Hayes under the terms of an employment contract. On January 6, 2004, Equality terminated her employment, and six months later, on June 30, 2004, closed its own doors and fired all of its remaining domestic and off-shore employees.

### 2. The Equality–MNC Transaction

On July 27, 2004, approximately a half-year after Equality terminated Hayes and a month after Equality ceased operations, MNC purchased a portion of Equality's assets for $965,000 in a transaction (the "Asset Transaction") governed by an asset sale agreement (the "Asset Sale Agreement") dated July 27, 2004, between, among others, Equality and MNC.[3] (*See* Def. Hearing Ex. 6.) The Asset Sale Agreement articulates the scope of the parties' transaction, delineating the assets transferred from Equality to MNC. Section 2.2 of the Asset Sale Agreement (" § 2.2") reads:

No *Assumption of Liabilities.* Purchaser does not assume or agree to pay, perform, discharge or be responsible for any liabilities, debts, obligations, expenses, agreements, leases, contracts or commitments of [Equality], whether

---

**2.** The factual summary that follows derives primarily from the following documents: the Complaint; the Hearing Transcript; Plaintiff's Exhibits to the Hearing; Defendants' Exhibits to the Hearing ("Def. Hearing Ex."); Affidavit of Charles Vaughn, dated May 24, 2010; Affidavit of Michael Flynn, dated May 12, 2010; Affidavit of Norman Field, dated May 20, 2010; and the Goldberg Certification. Except where specifically referenced, no further citation to these sources will be made.

**3.** Although the Asset Sale Agreement lists the price MNC paid as $950,000, it actually paid an extra $15,000 "because there was another order that [Equality] had discovered or we had discovered in talking about with our sales reps that we can fulfill and they had the inventory for it, so they ended up getting an additional 15,000." (Hearing Tr. at 28 (testimony of Charles Vaughn ("Vaughn")).)

known or unknown, fixed or contingent. [Equality] shall be responsible for any and all closure expenses for the facilities and employee compensation or benefits.

(*Id.*; *see* Hearing Tr. at 35–36) (testimony of Vaughn) (stating that MNC did not enter into any agreement with Equality to assume responsibility for any obligations owed to Hayes or other Equality employees in general; *id.* at 43 (testimony of Vaughn) ("If [Equality] owed someone for some inventory we did not promise to pay any vendor that they had essentially stiffed, which were all of their vendors. I think I read a statement from [§ ] 2.2, if you read it, that says we don't assume any liability for vendors or anything else.").)

In December 2003, Equality's final financial statement showed that it owned approximately $17 million in assets, including $4 million in machinery and $2 million in real estate. In the month preceding the Asset Transaction, Equality sold this machinery and real estate to entities unrelated to MNC. According to Hayes, MNC purchased the right to all of Equality's remaining assets.

Among the Equality assets purchased by MNC was its domain name, www.equalspec.com. (*See* Hearing Tr. at 28.) After the Asset Transaction, if an Internet user entered the website address for Equality (www.equalspec.com) in her browser, she would be redirected to MNC's website at www.mncstribbons.com.

When Hayes instituted the instant action, she served Equality by providing a summons and complaint to MNC through its receptionist, Yolanda Machado. The receptionist—who worked for MNC and not Equality—nevertheless accepted the summons and complaint on behalf of Equality. (*See id.* at 46–47,)

### 3. *Equality and MNC*

Vaughn worked for Equality from 1982 until January 2002 in various positions, ultimately serving as its president in the period preceding his departure. Michael Friedman ("Friedman"), who co-owned MNC at the time of the Asset Transaction, had also worked for Equality long before July 2004. Vaughn and Friedman both owned shares in one or more holding companies that held shares in Equality. Those minority interests were dissolved without compensation to Vaughn and Friedman well over a year before the Asset Transaction.

Upon Vaughn's exit, Equality required him to sign a one-year, non-competition agreement, ensuring that he would not start a competing business in that period. After leaving Equality and sitting on the sidelines while waiting for the one-year, non-competition term to lapse, Vaughn founded MNC.

Vaughn was MNC's sole shareholder until June 2004, when he sold a large portion of his interest in MNC to Friedman. At the time of the Asset Transaction in late July 2004, Vaughn and Friedman were the two majority shareholders of MNC. In this same time period, Harold Richards, Norman Field, Robert Yasinow, and Robert Saltsman purchased minority stakes in Equality.

When Vaughn left Equality in January of 2002, the company's majority owner was Saratoga Partners. Saratoga Partners has never owned or managed MNC. Vaughn had no professional relationship with, or interest in Saratoga Partners. Ultimately, upon financial distress, Saratoga Partners transferred Equality to the company's lenders (the "Lenders"), who likewise never owned or managed MNC. These independent Lenders owned Equality at the time of the Asset Transaction.

MNC, unlike Equality, never manufactured products in Saint Lucia. (Hearing Tr. at 20–21). MNC instead produced its goods out of factories in the Philippines and China. MNC never used any of the real estate that Equality sold for $2 million to a discrete company just prior to the Asset Transaction (including its Miami office and factory space), and likewise never used the manufacturing machinery that Equality sold for $4 million to an unrelated company in the same July 2004 time period. While Equality had offices in Chicago and New York, MNC never did.

Upon closing its doors. Equality discharged approximately ninety employees and agents domestically. MNC hired thirteen of them, with about half engaged as independent contractor sales representatives working out of their homes and compensated solely by commission. Equality also terminated all of its estimated 160 employees in Saint Lucia, none of whom were hired by MNC.

One of the thirteen former Equality employees hired by MNC as an independent sales contractor was Barb Lapping ("Lapping"). According to Vaughn, Lapping was neither an officer nor even an employee of MNC. (*See* Hearing Tr. at 44 (testimony of Vaughn) (testifying that Lapping was not an officer of any kind at MNC and was not given any authority to represent MNC in any capacity "other than [as] a sales rep to go out and book orders."); *id.* ("She was an independent [contractor] sales representative being paid ten percent for any orders that she could drum up ...").) On July 5, 2004, Lapping sent a letter (the "Lapping Letter"), stating:

> It is my pleasure to introduce MNC Sourcing Solutions as the new company I will be representing. MNC will be replacing Equality as your accessory packaging and display component vendor. I can assure you the basic day-to-day business and our relationship will remain the same and only the name will change.

(Def. Hearing Ex. 3.) There is no evidence on the record before this Court that either Vaughn or Friedman, or any MNC officer, ever instructed or even authorized Lapping to draft or send the letter.

Not only did MNC officers not instruct or authorize the Lapping Letter, but Equality promptly sent MNC a cease-and-desist letter (the "Cease–and–Desist Letter"), dated July 9, 2004, to stop any representation that MNC was a successor to Equality. The Cease–and–Desist Letter prominently displays the heading "CEASE AND DESIST," and states:

> Equality has discovered that [MNC, Vaughn, Friedman, and others] are working in concert and in furtherance of a scheme to deceive and mislead Equality's customers by claiming that [MNC] is Equality's successor. It is clear that you are attempting, among other things, to steal existing purchase orders that belong to, and which are the assets of, Equality.... As you are aware, you have no arrangement with Equality to acquire inventory on its behalf [and MNC] is not Equality's successor or replacement....

(*Id.* Ex. 4.)

That same day, MNC immediately responded to the warning letter by sending out a retraction letter (the "Retraction Letter") which states:

> In our haste to be responsive to our customers [sic] worried inquiries, a letter was sent out which could have incorrectly expressed the current situation. It was not meant to imply that you should cancel your purchase orders with Equality Specialties but that we would also be a source for these goods if you were to favor us with your orders.

(*Id.* Ex. 5.) Equality nevertheless sued Friedman and Vaughn in July 2004. (*See* Hearing Tr. at 27–28.) MNC asserts that it settled the lawsuit later in July by agreeing to the Asset Sale Agreement.

On this record, Hayes rests her claim against MNC for Equality's employee wages and debts under the doctrine of successor liability.

## II. *ANALYSIS*

### A. *SUMMARY JUDGMENT STANDARD*

In connection with a motion under Rule 56 of the Federal Rules of Civil Procedure, "[s]ummary judgment is proper if, viewing all the facts of the record in a light most favorable to the non-moving party, no genuine issue of material fact remains for adjudication." *Samuels v. Mockry,* 77 F.3d 34, 35 (2d Cir.1996) (*citing Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). The role of a court in ruling on such a motion "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 11 (2d Cir.1986). The moving party bears the burden of demonstrating that no genuine issue of material fact exists or that, because of the paucity of evidence presented by the non-movant, no rational jury could find in favor of the non-moving party. *See Gallo v. Prudential Residential Servs., L.P.,* 22 F.3d 1219, 1223 (2d Cir.1994).

### B. *SUCCESSOR LIABILITY*

As the Second Circuit has stated:

Under both New York law and traditional common law, a corporation that purchases the assets of another corporation is generally not liable for the seller's liabilities. Both New York law and traditional common law, however, recognize certain exceptions to this rule. Hence, ... a buyer of a corporation's assets will be liable as its successor if: '(1) it expressly or impliedly assumed the predecessor's ... liability, (2) there was a consolidation or merger of seller and purchaser, (3) the purchasing corporation was a mere continuation of the selling corporation, or (4) the transaction is entered into fraudulently to escape such obligations.'

*New York v. National Serv. Indust.,* 460 F.3d 201, 210 (2d Cir.2006) (*quoting Schumacher v. Richards Shear Co.,* 59 N.Y.2d 239, 464 N.Y.S.2d 437, 451 N.E.2d 195, 198 (1983)). Hayes, acknowledging the general rule,[4] contends that three exceptions apply here: (1) Equality merged, de facto, into MNC; (2) MNC impliedly assumed Equality's liability; and (3) MNC and Equality engaged in fraud to escape obligations.

---

**4.** MNC contends that none of the exceptions is applicable here because, at the threshold, it "cannot be liable as a successor because it did not purchase substantially all of Equality's assets" and instead "purchased only a small fraction of the assets." (Memorandum of Law of MNC Stribbons, Inc. and MNC Sourcing Solutions, Inc. in Supplement to the Evidentiary Hearing in Support of Their Motion for Summary Judgment, dated May 28, 2010, at 3.) The viability of MNC's argument turns on whether MNC purchased all of Equality's assets or only a small portion of the assets, which derivatively would be decided based on the timing of MNC's purchase and whether it bought substantially all of Equality's assets on July 27, 2004 or was merely one shopper checking out with purchases of some Equality assets at the Equality summer 2004 fire sale. The Court need not explore these issues because, as described below, even if MNC did purchase substantially all of Equality's assets, the Court finds that no rational jury could find successor liability given the paucity of supportive evidence presented by Hayes.

### 1. De Facto Merger

■ Hayes asserts that "MNC is a successor to Equality because it engaged in a de facto merger with Equality." (Pl.'s Opp. Br. at 7.) " 'A de facto merger occurs when a transaction, although not in form a merger, is in substance "a consolidation or merger of seller and purchaser." ' " *National Serv. Indust.*, 460 F.3d at 209 (*quoting Cargo Partner AG v. Albatrans, Inc.*, 352 F.3d 41, 45 (2d Cir.2003) (*quoting Schumacher*, 464 N.Y.S.2d 437, 451 N.E.2d at 198)). "[T]he hallmarks of a de facto merger include: (1) continuity of ownership; (2) cessation of ordinary business and dissolution of the acquired corporation as soon as possible; (3) assumption by the purchaser of the liabilities ordinarily necessary for the uninterrupted continuation of the business of the acquired corporation; and (4) continuity of management, personnel, physical location, assets, and general business operation." *National Serv. Indust.*, 460 F.3d at 209.

#### a. Continuity of Ownership

■ Aside from a bare, conclusory allegation, Hayes has presented no admissible evidence that Equality's owners had any ownership interest in MNC within a large time period surrounding the Asset Transaction. In the years preceding the Asset Transaction, Equality was owned by Saratoga Partners, followed by the Lenders. On the other hand, MNC provided sworn testimony to refute Hayes's unsubstantiated claim and support its contention that Saratoga Partners and the Lenders had no ownership interest in MNC. (*See, e.g.,* Hearing Tr. at 9–10, 13–14.)

Likewise, Hayes has not adduced evidence that the owners of MNC (including majority holders Vaughn and Friedman and minority stakeholders Harold Richards, Norman Field, Robert Yasinow, and Robert Saltsman) were owners of Equali-

ty. Hayes nevertheless asserts a continuity in ownership because "prior to MNC's purchase of Equality, Vaughn and Friedman also owned Equality shares including through one or more holding companies...." (Pl. Opp. Br. at 8.) The record demonstrates that any indirect ownership of Equality shares by Vaughn and Friedman ended long before the Asset Transaction. (*See* Hearing Tr. at 82.) The Court is not persuaded that these controlling shareholders' minority ownership of Equality shares through one or more holding companies that were dissolved without compensation to shareholders well over a year before the Asset Transaction, confers ownership for the purposes of finding a de facto merger.

Accordingly, the Court finds that Hayes has not presented any evidence to demonstrate a continuity of ownership between Equality and MNC. Thus, the Court concludes, based on the continuity requirement alone, that Hayes has failed to adduce evidence from which a reasonable jury could find successor liability. *See National Serv. Indust.*, 460 F.3d at 215 (stating that continuity of ownership is a necessary element of a de facto merger); *Cargo Partner*, 352 F.3d at 46.

#### b. Cessation of Ordinary Business and Dissolution of the Acquired Corporation As Soon As Possible

The Court finds that Hayes has presented evidence, when viewed in the light most favorable to her as the non-movant at summary judgment, to show that Equality ceased its operations shortly after the Asset Transaction. (*See, e.g.,* Def. Hearing Ex. 62 at 43; *id.* at 17); Hearing Tr. at 6 (statement of MNC counsel) ("[I]n June 30, 2004, Equality closed its doors and fired its 93 domestic employees and its 160 employees in Saint Lucia."; Hearing Tr. at 16–17 (testimony of Vaughn) (testifying

that Equality "literally padlocked all of [its] facilities" and "put guards in the facilit[ies] and they gave everyone literally half an hour to clear out their desk and told them that they were unemployed and that they were not going to be getting any severance or anything by way of compensation").)

### c. Assumption by the Purchaser of the Liabilities Ordinarily Necessary for the Uninterrupted Continuation of the Business of the Acquired Corporation

Hayes contends, despite the clear disclaimer on assuming liabilities found in § 2.2, that MNC impliedly assumed liability for Equality's alleged debts to Hayes, and indeed a larger swath of Equality's liability, because "MNC voluntarily paid the liability of Equality to pay the compensation of at least one employee (Rosemarie Barbatti) who stood in a similar position to Plaintiff for claims for unpaid compensation." (Pl. Opp. Br. at 10.) Vaughn testified that MNC "subsequently made a payment to [Barbatti] in settlement of [her claims for commissions that Equality allegedly owed her] because it was a nuisance suit that she had filed in Small Claims Court in California. It would have cost us more to defend ourselves against it than it would to settle it." (Hearing Tr. at 40.) According to Vaughn, Barbatti sought $5,000 in commissions that she alleged she earned in the general time period of the Asset Sale Agreement, and MNC paid her $3,000 to settle her claim. In contrast, Hayes seeks damages "exceed[ing] the sum of $75,000, exclusive of interest and costs" arising out of her employment and termination from Equality, over six months prior to the Asset Transaction. (Complaint ¶ 9.) The Court finds that Hayes, beyond her uncorroborated legal argument that Barbatti's situation was comparable to hers, has pointed to no evidence in the record on the basis of which a reasonable jury could find a larger intent on behalf of MNC to assume Equality's liabilities—let alone evidence sufficient for a rational factfinder to conclude that it implicitly assumed Equality's employee wages liability in the face of § 2.2's explicit disclaimer.

### d. Continuity of Management, Personnel, Physical Location, Assets, and General Business Operation

Hayes argues that "[c]ompelling evidence of MNC's intent [to absorb and continue Equality's general business operation] is found in the July, 2004 letters that MNC issued to Equality's customers that stated that MNC was succeeding Equality—and that the basic day-to-day business 'will remain the same and only the name will change.'" (Pl. Opp. Br. at 3 (quoting the Lapping Letter).) The "letters" and "compelling evidence" Hayes cites consists of a single document: the Lapping Letter. However, Hayes has not presented any evidence to support her contention that Lapping, in writing her letter, had authority to speak on behalf of MNC or act as its agent. In fact, the record, even when viewed most favorably to Hayes, compellingly demonstrates just the opposite. (See Hearing Tr. at 44 (testimony of Vaughn) (testifying that Lapping was simply an independent, commission-based sales contractor, not an officer of MNC, and that she was not given any authority to represent MNC in any capacity, other than as a sales representative "to go out and book orders"); id. at 44–45 (testifying that Lapping did not have any form of authority as an agent to write the Lapping Letter and was not instructed to write the letter by an officer of MNC).) Further, MNC retracted the Lapping Letter the same day that it received the Cease–and–Desist Letter from Equality. Not insignif-

icantly, both the Lapping Letter, dated July 5, 2004, and the Cease–and–Desist Letter, dated July 9, 2004, pre-date the July 27, 2004 Asset Transaction. (*See* Def. Hearing Exs. 3–5.) The Court is not persuaded that this pre-Asset Transaction letter, objected to by Equality in strong terms in the Cease–and–Desist Letter, and written by an independent contractor without direction or even authorization from MNC, could lead a reasonable jury to find that MNC continued Equality's general business operations.

Hayes further states that the record contains evidence of continuity of personnel because MNC hired some Equality employees. However, Hayes presents a paucity of evidence to back her bare assertion. MNC's hiring of only thirteen of the approximately ninety domestic employees or sales representatives that Equality fired in June 2004, and employing none of approximately 160 St. Lucia employees, is insufficient as a matter of law to raise a material issue of fact. *See Kretzmer v. Firesafe Prod. Corp.*, 24 A.D.3d 158, 805 N.Y.S.2d 340, 341 (1st Dep't 2005) ("The mere hiring of some of the predecessor's employees is insufficient to raise a triable issue as to continuity of management."); *Subramani v. Bruno Machinery Corp.*, 289 A.D.2d 167, 736 N.Y.S.2d 315, 316 (1st Dep't 2001) ("[The alleged successor's] use of some of [the alleged predecessor's] workers and its physical plant shows neither a de facto merger with nor a mere continuation of [the predecessor.]").

Further, MNC has produced evidence, once again uncontroverted by Hayes, demonstrating a lack of business continuity. For example, in July 2004, immediately prior to the Asset Transaction, Equality sold approximately $4 million of machinery to a company with which MNC never had any relationship and approximately $2 million of real estate to another unrelated company. Equality manufactured its product in St. Lucia and in Miami while MNC never produced goods in these locations and never used any of Equality's machinery even in crafting its products in its separate factories in distinct countries. Lastly, Equality had offices in New York and Chicago, while MNC never had offices in either location, and MNC did not take over Equality's Miami offices when Equality ceased operating.

Hayes also seeks to establish continuity because MNC's receptionist accepted the summons and complaint in this action on behalf of Equality. (*See* Hearing Tr. at 46–47.) The Court notes that the receptionist, according to the public record in this case, also accepted service of process on the same day (presumably from the same process server at the same time at the same front reception desk) for MNC. Hayes has presented no evidence that the receptionist was given authority by MNC to accept process on behalf of other entities, or that MNC otherwise deemed the ministerial act of accepting process as conferring a binding legal obligation on it flowing merely from that incident. Thus, the Court does not find compelling the notion that MNC's receptionist's acceptance of the summons and complaint on behalf of Equality confers successor liability on that entity. Similarly, even when resolving ambiguities and drawing reasonable inferences against MNC, MNC's receptionist's administrative act proves little as to continuity of business operations.

Hayes further asserts "compelling evidence of a successor relationship" in the form of the website redirect for Equality. Here, MNC purchased Equality's domain name as an individual asset. (*See id.* at 28 (testimony of Vaughn) ("We got ahold [sic] of the website, their intangible assets. They didn't have anybody else who would buy any of that so they were glad to sell it

for anything to us.").) The Court is not persuaded that the website redirect, a lone twig of continuity standing in an otherwise empty field, confers sufficient corporate continuity—especially in the context of an asset sale in which MNC bought the domain name under an agreement containing a broad disclaimer of liabilities. (*See* Def. Ex. 6, § 2.2.) Thus, the Court concludes that Hayes, even when the evidence in the record is construed in the light most favorable to her, has failed to adduce evidence sufficient for a rational jury to find that Equality merged, de facto, into MNC.

### 2. *MNC Impliedly Assumed Liabilities of Equality*

■ Hayes contends that "MNC is also liable as a successor to Equality because it impliedly assumed liabilities of Equality." (Pl.'s Opp. Br. at 13.) Hayes spills little ink on articulating evidentiary facts in the record to substantiate this bare assertion. As discussed above, Hayes's allegation that "MNC voluntarily paid the liability of Equality to pay the compensation of at least one employee (Rosemarie Barbatti) who stood in a similar position to Plaintiff for claims for unpaid wages and assumed certain liabilities of Equality under the Asset Agreement," especially given the factual differences between Barbatti's claim and Hayes's suit, simply does not constitute a sufficient basis from which a reasonable factfinder could infer that MNC impliedly assumed Equality's liabilities. (Pl. Opp. Br. at 13.) Accordingly, the Court concludes that Hayes had not presented evidence as to any MNC implicit

assumption of Equality liabilities sufficient to survive summary judgment.

### 3. *Fraud*

Although Hayes did not present her fraud argument at the Hearing,[5] nor in her Complaint, she now argues that MNC is liable as a successor because it engaged in fraud. The Court, in its discretion, may refuse to consider an argument presented for the first time in response to a summary judgment motion that effectively seeks to amend the complaint. *See Bellotto v. County of Orange*, 248 Fed.Appx. 232, 235–36 (2d Cir.2007). Accordingly, the Court will not consider Hayes's argument because it is improperly presented.

Even if the Court considered Hayes's fraud theory, her claim would still fail. According to Hayes, fraud is indicated by the low price for which MNC acquired Equality's remaining assets at the Lenders' summer 2004 quick sale. However, she does not point to any evidence in the record from which a reasonable juror could find fraud in the Asset Transaction.[6] Accordingly, Hayes has failed to back her new, bare assertion with any evidence of fraud in the record. Thus, the Court finds that Hayes's fraud argument fails for the additional reason that it does not raise a triable issue of fact as to any fraud committed by MNC sufficient to survive summary judgment.

In sum, the Court concludes that MNC has carried its burden of demonstrating that Hayes has failed to present sufficient evidence, even when viewed most favor-

---

**5.** At the Hearing, counsel stated: "There are several avenues to pursue successor liability. At this stage of the case based on the discovery that has been taken so far the plaintiff has two avenues that we are proceeding under. One is the de facto merger standard and the other is impliedly assuming the liability of Equality." (Hearing Tr. at 52.)

**6.** Despite Hayes's theory, Vaughn's testimony suggested just the opposite: that MNC was strong-armed through an Equality lawsuit to purchase $965,000 of Equality assets. (*See, e.g.*, Hearing Tr. at 40–41.)

ably to her, to establish triable issues of facts as to MNC's successor liability. On this record, "because of the paucity of evidence presented by the non-movant, no rational jury could find in favor of the non-moving party." *Gallo,* 22 F.3d at 1223.

### III. *ORDER*

For the reasons stated above, it is hereby

**ORDERED** that the motion of defendants MNC Stribbons, Inc. and MNC Sourcing Solutions, Inc. for summary judgment is GRANTED; and it is further

**ORDERED** that the plaintiff Bonnie Hayes is directed to move for a default judgment against the only remaining defendant. Equality Specialties, Inc., or to voluntarily dismiss the action by September 17, 2010.

**SO ORDERED.**